**PARALYZED VETERANS OF AMERICA, et al., Appellees/Cross–Appellants**

v.

**D.C. ARENA L.P., A District of Columbia Limited Partnership, et al., Appellants/Cross–Appellees**

Nos. 97–7005, 97–7017.

United States Court of Appeals, District of Columbia Circuit.

Argued May 9, 1997.

Decided July 1, 1997.

John G. Kester, Washington, DC, argued the cause for appellants, with whom Brendan V. Sullivan, Jr., Paul Mogin, and Thomas G. Hentoff were on the briefs.

Niki Kuckes, Washington, DC, argued the cause for appellees, with whom William H. Jeffress, Jr., David S. Cohen, and Lawrence B. Hagel were on the briefs.

Samuel R. Bagenstos, Attorney, United States Department of Justice, Washington, DC, argued the cause and filed the brief for amicus curiae the Unites States.

Before EDWARDS, Chief Judge, SILBERMAN and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

Appellees/cross-appellants (appellees) sued appellants/cross-appellees (appellants) to require that the wheelchair seating in an arena under construction provide lines of sight over standing spectators. The district court concluded that most, but not all, of the wheelchair seating must have such sightlines. We affirm.

## I.

Appellants own and will operate the MCI Center, an arena currently under construction in downtown Washington, D.C. It will house the NBA's Washington Wizards and the NHL's Washington Capitals, and will host concerts and other special events. One aspect of the design of any arena is the choice of the "seating bowls," a selection that determines what seats will be offered for sale at what events. Because the games and events will be exciting affairs and the patrons are expected, even encouraged at times, to stand and cheer for the home teams, wheelchair users are understandably concerned about whether the seats available to them will allow them to see the action during the most dramatic moments.

The case arises under Title III of the Americans with Disabilities Act, 42 U.S.C. § 12181 *et seq.* (1994). The general rule of Title III provides:

No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

*Id.* § 12182(a). Newly constructed facilities subject to the ADA must be "readily accessible to and usable by individuals with disabilities." *Id.* § 12183(a)(1). Congress has directed the Department of Justice to flesh out these general principles by "issu[ing] regulations ... that include standards applicable to facilities" covered by Title III. *Id.* § 12186(b). One of these regulations, known as Standard 4.33.3, is the centerpiece of this litigation. It states:

Wheelchair areas shall be an integral part of any fixed seating plan and shall be *provided so as to provide people with physical disabilities a choice of admission prices and lines of sight comparable to those for members of the general public.* ... At least one companion fixed seat shall be provided next to each wheelchair seating area. When the seating capacity exceeds 300, wheelchair spaces shall be provided in more than one location....

28 C.F.R. Part 36, App. A, § 4.33.3 (1996). The controversy concerns whether the "lines of sight comparable" language of Standard 4.33.3 requires wheelchair seats to afford sightlines over standing spectators.

The Department did not actually draft the language of Standard 4.33.3; it was fashioned by the Architectural and Transportation Barriers Compliance Board, known as the Access Board. Congress had instructed that Justice's regulations be "consistent with the minimum guidelines and requirements issued by" the Board. 42 U.S.C. § 12182(c). It is comprised of 13 individuals appointed by the president and representatives of 12 government departments or agencies, including the Department of Justice. *See* 29 U.S.C. § 792(a)(1) (1994). And it is charged, *inter alia*, with "develop[ing] advisory guidelines for," and "establish[ing] and maintain[ing] *minimum* guidelines and requirements for the standards issued pursuant to," Title III of the ADA. *Id.* § 792(b)(2), (3) (emphasis added).

In January of 1991, the Board proposed accessibility guidelines, one of which would have required that wheelchair seating be "located to provide lines of sight comparable to those for all viewing areas." It pointed out that its wording "may not suffice in sports arenas or race tracks where the audience frequently stands." Therefore it solicited comments on "whether full lines of sight over standing spectators ... should be required." 56 Fed.Reg. 2296, 2314 (1991). Meanwhile, in February of that year, the Justice Department issued its own notice of proposed rule-making in which it proposed, *inter alia*, "to adopt [the Access Board's] guidelines as the accessibility standard applicable under this rule" and in which it directed "any comments" to those guidelines to be sent to the Board. 56 Fed.Reg. 7452, 7478–79 (1991). Although "[m]any commenters ... recommended that lines of sight should be provided over standing spectators," the Board in July issued a guideline, essentially the same as the proposal, that omitted reference to the standing spectator problem: it recommended "lines of sight comparable to those available to the rest of the public," and stated that the issue of lines of sight over standing spectators "[would] be addressed in guidelines for recreational facilities." 56 Fed.Reg. 35,408, 35,440 (1991); *see also* 56 Fed.Reg. at 60,618. On the same day, the Department promulgated Standard 4.33.3, worded identically to the Board's guideline.

Unlike the Board, the Department did not initially express a view on whether the "lines of sight comparable" language required sightlines over standing spectators. In a 1992 speech to a conference of Major League Baseball stadium operators, the deputy chief of the Public Access Section of the Department of Justice did say that "[t]here is no requirement of line of sight over standing spectators." By the middle of 1993, however, when Justice initiated its investigation into the accessibility of venues for the 1996 summer Olympic games, it began taking the position that "lines of sight comparable to those for members of the general public" meant "line[s] of sight over standing spectators."[1]

Then, in late 1994, Justice undertook to publicize more formally its position that "lines of sight comparable" included sightlines over standing spectators. As part of its Title III regulatory responsibility, Justice is required to "ensure the availability and provision of appropriate technical assistance manuals." 42 U.S.C. § 12206(c)(3). The Department's first *Americans with Disabilities Act Title III Technical Assistance Manual,* and several successive annual supplements, contained exceedingly detailed requirements

---

1. The Olympics investigation culminated in May of 1996 with a settlement that identified Olympic Stadium as "the most accessible stadium in the world," in part because "virtually all wheelchair seats have a comparable 'line of sight,' so that wheelchair users can still see the playing surface even when spectators in front of them stand up during the event."

for compliance with Title III, but said nothing about sightlines over standing spectators. But, in December, the Department published, without notice and comment, a supplement to its manual that explicitly interpreted "lines of sight comparable" to require sightlines over standing spectators. The supplement noted that "wheelchair locations [must] provide ... lines of sight comparable to those for members of the general public," and stated, "[t]hus, in assembly areas where spectators can be expected to stand during the event or show being viewed, the wheelchair locations must provide *lines of sight over spectators who stand.*" (Emphasis added.)

A month after Justice issued the supplement appellants chose four seating bowls for the MCI Center: one each for hockey and basketball games and two for concerts. The seating bowls that appellants settled on included wheelchair seating in the amount of more than 1% of the total seats, as required by regulation, and they allowed for a variety of admission prices and locations in the arena. Some, but not all, of the wheelchair seating in the chosen designs would have lines of sight over standing spectators. It is undisputed that, as they evaluated their options, appellants were fully aware that the Justice Department had taken the position that "lines of sight comparable" includes sightlines over standing spectators.

Appellees, the Paralyzed Veterans of America and several Washington-area sports enthusiasts who use wheelchairs, challenged the seating bowl designs in the district court under the ADA's private right of action. *See* 42 U.S.C. § 12188 (1994). They focused on Standard 4.33.3's requirements that wheelchair seating be integrated with seating for ambulatory patrons, that it be dispersed throughout the facility, and, at least as interpreted by Justice, that it provide lines of sight over spectators who can be expected to stand. Appellants responded that the seating bowls fully satisfied the integration and dispersal requirements, and that Standard 4.33.3 properly read did not require that wheelchair seating provide sightlines over standing spectators. The Department, despite its own enforcement authority in the

statute, *see* 42 U.S.C. § 12188(b), and notwithstanding several invitations by the district judge, refused to intervene in the case. In contrast to its rather aggressive enforcement posture in other similar cases, *see generally* David W. Dunlap, *The Disabled Present New Hurdles for Architects,* N.Y. TIMES, June 1, 1997, at 30, Justice sought to participate only as *amicus.* The district court granted the Department leave to file a brief but did not allow it to participate at oral argument. The court refused to allow Justice to file a second brief which would have "address[ed] [appellants'] arguments about the Department of Justice's interpretation and enforcement of ... the ADA's Standards for Accessible Design."

The district judge concluded that, although the wheelchair seating in the proposed seating bowls was sufficiently integrated with the seating for ambulatory patrons, it was not adequately dispersed. As for the sightlines requirement, the only issue that the parties appeal, the district judge agreed with appellees in the main. He concluded that Justice's manual interpretation was a binding construction of its own regulation to which he should defer. But he determined that the regulation, as actually applied, did not require that *every* wheelchair seat have a line of sight over standing spectators. In light of his perception of Justice's enforcement positions—what he termed a "hazy tapestry of action and inaction"—along with the good faith of appellants, he concluded that "substantial compliance" was sufficient. Accordingly, although he found appellants' initial plan deficient, he subsequently approved a plan which would provide sightlines over standing spectators in 78% of the wheelchair seating in one configuration, and 85% to 88% in the other three.

The district court's decision is challenged from both directions. Appellants claim the court erred in reading 4.33.3 to require *any* sightlines over standing spectators. Appellees believe the only error was in not requiring that *all* wheelchair seating have such sightlines.

## II.

It should be understood that appellants do not contend that the Department's interpre-

tation of the regulation is unfaithful to the governing statute. This case involves just the proper interpretation of the regulation. Still, it raises important doctrinal issues. Appellants present three arguments directed at the district judge's acceptance of the Department's interpretation of the regulation. First, it is claimed that the Department and the district judge have it flatly wrong; the language of the regulation simply will not bear the interpretation the manual places on it. Second, even if we think the regulation is ambiguous, we should approach the task of interpretation with fresh eyes—in other words, without granting deference to the Department's interpretation. As such, we should conclude that appellants' reading of the regulation is the better one. Third, even if Justice could have interpreted the regulation as it has in the manual as an initial matter, the Department actually originally adopted the interpretation appellants place on it. Accordingly, the Department's change in interpretation is contrary to the Administrative Procedure Act because it circumvents section 553, which requires that notice and comment accompany the amendment of regulations. *See* 5 U.S.C. § 553 (1994). Even if not a change, it constitutes a substantive addition which itself requires notice and comment.

### A.

The phrase "lines of sight comparable to those for members of the general public," appellants argue, means only that wheelchair areas are to be dispersed throughout a facility. All different geographical locations within that facility are to be available to wheelchair users. Appellees and the government, in its *amicus* brief, point out that the regulation, by requiring facilities with over 300 seats to provide wheelchair seating "in more than one location" and to give wheelchair users a choice of admission prices, already accomplishes the dispersal objective, and therefore "lines of sight comparable" must have an added meaning—and the most obvious is an unobstructed view. We agree. We think the language "lines of sight comparable" quite naturally is interpreted to refer to the ability of a wheelchair user to see a performance without any obstruction.

Appellants maintain nevertheless that "lines of sight comparable"—by the time it was used in the regulation—had gathered a specific meaning, a meaning other than that which the Department manual ascribes to it. (Appellants do not even concede that the regulation refers to obstructions, but, in any event, according to them, it certainly does not cover a temporary obstruction caused by standing spectators.) The language had its genesis apparently in guidance issued by the American National Standards Institute, a private body, in 1980. Appellants contend that there is no contemporary manifestation—not even a hint—that the Institute meant the phrase to reach the standing spectator problem. That may be so. Still, as appellees and the government correctly insist, there was no uniformly understood construction of the language prior to the time it was picked up by the Board and the Department. Although there is no indication that the words were intended to address sight-lines over standing spectators, neither is there any evidence to the contrary. The words simply had not taken on a well-understood meaning. It could be that the Board, picking up the phrase from the Standards Institute, *intended* it to be limited to permanent obstructions, not standing spectators, but as we discuss *infra*, that is relevant to the question whether Justice's manual interpretation is entitled to deference and whether it should be thought a modification of the regulation; it does not demonstrate that "lines of sight comparable" had developed a universally accepted linguistic meaning contrary to the one Justice asserts.

### B.

We thus think the phrase "lines of sight comparable" is easily read as a view no more obstructed than would be available to non-wheelchair users. But whether that refers only to permanent obstructions or those caused temporarily by standing spectators—particularly vexing to those in wheelchairs (children and shorter people may be able to stand on the seats)—is by no means obvious. As applied to that situation, the phrase is ambiguous, which gives rise to the second

question: whether the manual interpretation is entitled to deference.

■ Agency interpretations of their own regulations have been afforded deference by federal reviewing courts for a very long time and are sustained unless "plainly erroneous or inconsistent" with the regulation. *See, e.g., Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 2386, 129 L.Ed.2d 405 (1994); *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945). It is sometimes said that this deference is even *greater* than that granted an agency interpretation of a statute it is entrusted to administer. *See, e.g., Capital Network Sys., Inc. v. FCC,* 28 F.3d 201, 206 (D.C.Cir.1994). In the aftermath of *Chevron,* it may be that our deference to agency interpretations of ambiguous regulations is no different than that which we afford to interpretations of ambiguous statutes. It would seem that there are few, if any, cases in which the standard applicable under *Chevron* would yield a different result than the "plainly erroneous or inconsistent" standard set forth in *Bowles v. Seminole Rock & Sand Co., supra.* After all, *Chevron* requires a reviewing court to affirm a permissible (or reasonable) interpretation of an ambiguous statute, and we very much doubt that we would defer to an *unreasonable* agency interpretation of an ambiguous regulation. *See Thomas Jefferson,* 512 U.S. at 512, 114 S.Ct. at 2386.

■ Of late, it has been argued that the Supreme Court should abandon deference to agency interpretations of ambiguous regulations, because it arguably creates perverse incentives for an agency to draft vague regulations that give inadequate guidance. *See* John F. Manning, *Constitutional Structure and Judicial Deference to Agency Interpretations of Agency Rules,* 96 Colum. L.Rev. 612 (1996);[2] *cf. Shalala v. Guernsey Memorial Hosp.,* 514 U.S. 87, 108–09, 115 S.Ct. 1232, 1243, 131 L.Ed.2d 106 (1995) (O'Connor, J., dissenting) (criticizing Court for deferring to an agency interpretation "that would force us to conclude that [the Secretary] has not fulfilled her statutory duty"); *Thomas Jefferson,* 512 U.S. at 524, 114 S.Ct. at 2392 (Thomas, J., dissenting). Although the Court has only very recently reaffirmed its doctrine of deference of this kind, *see Auer v. Robbins,* —— U.S. ——, ——, 117 S.Ct. 905, 911, 137 L.Ed.2d 79 (1997), there is, to be sure, an outer limit to that deference imposed by the Administrative Procedure Act. A substantive regulation must have sufficient content and definitiveness as to be a meaningful exercise in agency lawmaking. It is certainly not open to an agency to promulgate mush and then give it concrete form only through subsequent less formal "interpretations." *Compare* Manning, *supra,* at 655–57. That technique would circumvent section 553, the notice and comment procedures of the APA.[3] But appellants do not actually argue that the regulation at issue is of that type—and we do not think it can be

**2.** Professor Manning acknowledges that an agency's authority to proceed through adjudication, rather than rulemaking, may reduce that incentive but here the Department must seek enforcement in federal court.

His prescription is that the rule of ordinary contract interpretation—that ambiguities are construed against the drafter—should apply to agency regulations. We think his contract model for an agency drafting regulations does not quite fit; it assumes that the only two "parties" are the agency and the regulated class. Actually, when an agency promulgates regulations, just as when Congress passes legislation, many different parties are affected and that includes various sorts of beneficiaries who may have an interest in giving the agency the benefit of the doubt. We nevertheless appreciate serious discussions of legal doctrine, increasingly rare in the leading law

journals. *See* Harry T. Edwards, *The Growing Disjunction Between Legal Education and the Legal Profession,* 91 Mich L.Rev. 34, 42 (1992); *United States v. Six Hundred and Thirty–Nine Thousand Five Hundred and Fifty–Eight Dollars in U.S. Currency,* 955 F.2d 712, 722 (D.C.Cir. 1992) (Silberman, J., concurring); *see also* Deborah J. Merritt & Melanie Putnam, *Judges and Scholars: Do Courts and Scholarly Journals Cite the Same Law Review Articles?* 71 Chi-Kent L. Rev. 871 (1996).

**3.** In that regard, surely the APA imposes a considerably tighter restriction than does the non-delegation doctrine as applied to legislation. *See Industrial Union Dep't, AFL–CIO v. American Petroleum Inst.,* 448 U.S. 607, 100 S.Ct. 2844, 65 L.Ed.2d 1010 (1980). Indeed, a broad delegation of substantive authority may require stricter procedural safeguards.

so fairly characterized.[4] Nor do we believe the proposed regulation did not give adequate notice that it *could* be interpreted as the Department now does. Anyone considering the phrase "lines of sight comparable" should have thought that it might imply an unobstructed view over standing spectators.

Appellants, nevertheless, argue that deference is inappropriate here because it was not the Department of Justice that actually drafted the regulation; it was the Access Board which did so, as a proposed guideline. Indeed, Justice's notice indicated that it intended to adopt the Board's standards and that responses should be directed to the Board, thus suggesting that it was the Board that controlled the process by which the language of both the guideline and the regulation was to be adopted. We do not defer, however, to an administrative agency's interpretation of its regulation solely because its employees are the drafters and presumably have superior knowledge as to what they intended. Of course, contemporary indications as to what the agency meant by the language used, such as the comments received, could play the same role as legislative history does in both steps of a *Chevron* analysis. *See, e.g., King Broadcasting Co. v. FCC,* 860 F.2d 465, 469 (D.C.Cir.1988); *City of Cleveland v. NRC,* 68 F.3d 1361, 1366 (D.C.Cir.1995). But the doctrine of deference is based primarily on the agency's statutory role as the sponsor of the regulation, not necessarily on its drafting expertise. *See Arkansas v. Oklahoma,* 503 U.S. 91, 110, 112, 112 S.Ct. 1046, 1058, 1059, 117 L.Ed.2d 239 (1992); *American Train Dispatchers Ass'n v. ICC,* 54 F.3d 842, 848 (D.C.Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1261, 134 L.Ed.2d 210 (1996); *see also Pauley v. Beth-Energy Mines, Inc.,* 501 U.S. 680, 111 S.Ct. 2524, 115 L.Ed.2d 604 (1991). Under *Chevron,* an agency's interpretation of ambiguous statutory language is entitled to deference because of the agency's delegated authority to administer the statute, and the same consideration underlies deference to an agency's interpretation of its own regulation. The resolution of ambiguities in a regulation implicates the same sort of policy choices it does with regard to a statute, *see, e.g., Pauley,* 501 U.S. at 697, 111 S.Ct. at 2534, and Congress should therefore be thought to have delegated to agencies the authority to reconcile regulatory ambiguities. Once the Board's language was put out by the Department as its own regulation, it became, as the statute contemplates, the Justice Department's and only the Justice Department's responsibility. That is why this case is different from those upon which appellants rely involving a statute (or regulation) administered by more than one department or agency. *See, e.g., Wachtel v. OTS,* 982 F.2d 581, 585 (D.C.Cir.1993); *Association of Am. Physicians and Surgeons, Inc. v. Clinton,* 997 F.2d 898, 913 (D.C.Cir.1993).

We recognize that the Department has no administrative adjudicatory authority which it could use to interpret its regulation; either it or a private party must go to federal court to enforce the regulation. Yet Congress unquestionably delegated to the Department the authority to flesh out the statutory framework by issuance of its regulations, so the Department has a good deal more legal/policymaking authority than would be true if it had merely a prosecuting role. *Compare Kelley v. EPA,* 15 F.3d 1100, 1108 (D.C.Cir.1994), *cert. denied,* 513 U.S. 1110, 115 S.Ct. 900, 130 L.Ed.2d 784 (1995).[5] Moreover—and we think this is significant—Congress, by specifically requiring the publication of a technical manual that would further refine or interpret in detail the regulation's substantive obligations, contemplated a continuing administration of the regulation that approaches, if not equates with, the adjudicatory authority of other statutory schemes.

---

**4.** Appellants do argue that the *interpretation* violates section 553 because it reversed prior agency position. That argument is taken up *infra.*

**5.** Appellants mistakenly rely on *Kelley* to suggest that the Department is not entitled to deference because this is a suit between private persons brought under the ADA's private right of action. There, we concluded that the EPA lacked statutory authority to issue regulations defining CERCLA liability of a particular class where the statute provided that liability would be determined by the court.

## C.

We have concluded that the language of Standard 4.33.3 is susceptible to Justice's present interpretation and that the statutory scheme contemplates that we would defer to the Department's reasonable interpretations of its regulation as set forth in the technical manual. That does not mean that appellees and the government are home free regarding their interpretation of the regulation. Appellants' most powerful argument remains: that the Department of Justice's present interpretation of the regulation constitutes a fundamental modification of its previous interpretation and, even if it legitimately could have reached the present interpretation originally, it cannot switch its position merely by revising the technical manual. Once an agency gives its regulation an interpretation, it can only change that interpretation as it would formally modify the regulation itself: through the process of notice and comment rulemaking.

■ The government asserts that even if appellants' characterization of the Justice Department's initial treatment of the regulation were correct—which both it and appellees deny—an agency is completely free to change its interpretation of an ambiguous regulation so long as the regulation reasonably will bear the second interpretation. The government argues that an agency has the same latitude to modify its interpretation of a regulation as it does its interpretation of a statute under *Chevron.* We think the government is wrong. The premise of *Chevron,* as we have noted, is that Congress has delegated *implicitly* to administrative agencies and departments the authority to reconcile, within reason, ambiguities in statutes that the agencies and departments are charged with administering. *See, e.g., Kelley,* 15 F.3d at 1108; *Oil, Chem. & Atomic Workers Int'l Union, AFL–CIO v. NLRB,* 46 F.3d 82, 90 (D.C.Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 81, 133 L.Ed.2d 39 (1995). That delegation is, as the Supreme Court recognized in *Chevron,* itself a continuing one; there is no barrier to an agency altering its initial interpretation to adopt another reasonable interpretation—even one that represents a new policy response generated by a different

administration. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 863, 104 S.Ct. 2778, 2791, 81 L.Ed.2d 694 (1984). The government is certainly correct in suggesting that the doctrine of deference to an agency's interpretation of its own regulation and *Chevron* deference are analogous. But Congress—and it is congressional will that is crucial—has said more, specifically on the subject of regulations. Under the APA, agencies are obliged to engage in notice and comment before formulating regulations, which applies as well to *"repeals"* or *"amendments." See* 5 U.S.C. § 551(5). To allow an agency to make a fundamental change in its interpretation of a substantive regulation without notice and comment obviously would undermine those APA requirements. That is surely why the Supreme Court has noted (in dicta) that APA rulemaking is required where an interpretation "adopt[s] a new position inconsistent with ... existing regulations." *Shalala v. Guernsey Memorial Hosp.,* 514 U.S. 87, 100, 115 S.Ct. 1232, 1239, 131 L.Ed.2d 106 (1995); *see also National Family Planning & Reproductive Health Ass'n v. Sullivan,* 979 F.2d 227, 240–41 (D.C.Cir.1992).

We therefore reject the government's bold, complete analogy to *Chevron* and turn to the question whether the Department should be regarded, as appellants argue, as having actually "amended" its regulation without notice and comment in contravention of section 553. Appellees and the government insist that no authoritative interpretation of the phrase "lines of sight comparable" was ever presented until the supplement to the manual was published in 1994. As we have described, the Board in its notice of proposed rulemaking conceded that the guidelines "may not suffice in sports arenas or race tracks where the audience frequently stands." It solicited comments on "whether full lines of sight over standing spectators ... should be required," and in promulgating the final rule the Board acknowledged that "[m]any commenters ... recommended that lines of sight should be provided over standing spectators"—which implies that the Board did not believe its guidelines alleviated their concern. 56 Fed.Reg. at 35,440. It

then stated its "intention to address the issue of lines of sight over standing spectators in the guidelines for recreational facilities which will be proposed at a future date." 56 Fed. Reg. at 60,618.

If the Department, when it promulgated the regulation, had said what the Board said, or even clearly adopted what the Board said, it would be hard to conclude that the Department did not subsequently "amend" the regulation in violation of the APA. But Justice did not do so in its statement of basis and purpose. It never referred to the Board's concern, nor did it imply that its regulation did not address the problem of lines of sight over standing spectators. It may well be that it is a plausible inference that Justice, at the time, deliberately intended the regulation to mean the same thing as did the Board— but it is not a necessary inference. And, as we have observed, Congress did not mandate that Justice follow the Board's guidelines. It said only that "[s]tandards included in regulations issued under [the facility provisions of Title III] shall be *consistent* with the *minimum* guidelines and requirements issued by the ... Board." 42 U.S.C. § 12186(c) (emphasis added). Nothing prevented the Department from imposing a greater burden on those entities covered by its regulation.

Appellants, in their effort to tease out of events prior to the 1994 supplement a previous inconsistent department interpretation, can point only to a speech given by the deputy chief of the Public Access Section of the Civil Rights Division to Major League Baseball stadium operators, in which she said "[t]here is no requirement for line of sight over standing spectators." [6] A speech of a mid-level official of an agency, however, is not the sort of "fair and considered judgment" that can be thought of as an authoritative departmental position. *Auer*, —— U.S. at ——, 117 S.Ct. at 912; *see also Drummond Coal Co. v. Hodel*, 796 F.2d 503, 508 (D.C.Cir.1986), *cert. denied*, 480 U.S. 941, 107

S.Ct. 1593, 94 L.Ed.2d 782 (1987). It is not equivalent to the technical assistance manual, which "represented formal agency action upon which affected parties could reasonably rely, in contrast to the informal, nonauthoritative nature of what had gone before." *New York State Dep't of Soc. Serv. v. Bowen*, 835 F.2d 360, 366 (D.C.Cir.1987), *cert. denied*, 486 U.S. 1055, 108 S.Ct. 2820, 100 L.Ed.2d 922 (1988). If the supplement to the manual had *not* issued prior to appellants' commencement of arena planning, the speech might well take on added significance, but it is not open to appellants to claim that they reasonably relied to their detriment on the speech or any other indication of the Department's interpretation. As noted, there is no question but that appellants were on notice of Justice's interpretation. *See Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1235 n. 14 (D.C.Cir.1994); *compare Satellite Broadcasting Co., Inc. v. FCC*, 824 F.2d 1, 4 (D.C.Cir.1987) (if an agency "wishes to use [an] interpretation to cut off a party's right, it must give full notice of its interpretation").

We admit the issue is not easy; appellants almost but do not quite establish that the Department significantly changed its interpretation of the regulation when it issued the 1994 technical manual. We conclude finally, however, that the Department never authoritatively adopted a position contrary to its manual interpretation and as such it is a permissible construction of the regulation.

We are left with the question whether the interpretation is itself a "substantive rule" having the force of law and, for that independent but related reason, is subject to notice and comment. *See* 5 U.S.C. § 553(b), (b)(3)(A). As we have often recognized, it is quite difficult to draw a line between substantive and interpretative rules. *See, e.g., American Mining Congress v. MSHA*, 995 F.2d 1106, 1108–09 (D.C.Cir.1993); *American Hosp. Ass'n v. Bowen*, 834 F.2d 1037,

---

**6.** The Assistant Attorney General in charge of the Civil Rights Division (to which the Department has delegated enforcement of Title III) testified that from 1991 until he left office in 1993 "it was never the position ... of Justice that wheelchair locations were required to have lines of sight over spectators ... who spontaneously stand."

That testimony, putting aside its negative phrasing, is no more probative than would be a congressman's post-enactment testimony as to what Congress intended when it passed legislation. *See, e.g., Pierce v. Underwood*, 487 U.S. 552, 556–67, 108 S.Ct. 2541, 2545–46, 101 L.Ed.2d 490 (1988).

1046 (D.C.Cir.1987). A number of our cases suggest the result turns on whether the agency "intend[s]" the rule "to create new rights or duties." *See, e.g., Orengo–Caraballo,* 11 F.3d 186, 195 (D.C.Cir.1993). But we have recognized that a stated intent to treat a major substantive legal addition as an "interpretative" rule will not by itself suffice to escape the notice and comment requirements of section 553. *See American Mining Congress,* 995 F.2d at 1109–10; *Chamber of Commerce v. OSHA,* 636 F.2d 464, 468 (D.C.Cir. 1980). We still must look to whether the interpretation itself carries "the force and effect of law," *see American Mining Congress,* 995 F.2d at 1109 (*citing* Attorney General's Manual on the Administrative Procedure Act (1947)), or rather whether it spells out a duty fairly encompassed within the regulation that the interpretation purports to construe. *See, e.g., Kelley,* 15 F.3d at 1108.

■ The Department's interpretation of its regulation, of course, has real consequences. But that is always true when a Department or agency selects an interpretation of an ambiguous statute or rule, and often we acknowledge a government agency's right to do so as an "interpretative" rule without notice and comment. *See, e.g., Fertilizer Inst. v. EPA,* 935 F.2d 1303, 1308 (D.C.Cir.1991). The distinction between an interpretative and substantive rule more likely turns on how tightly the agency's interpretation is drawn linguistically from the actual language of the statute or rule. *See, e.g., Chamber of Commerce,* 636 F.2d at 469. If the statute or rule to be interpreted is itself very general, using terms like "equitable" or "fair," and the "interpretation" really provides all the guidance, then the latter will more likely be a substantive regulation. *See, e.g., United States v. Picciotto,* 875 F.2d 345, 348 (D.C.Cir.1989). Here, however, the government's position is driven by the actual meaning it ascribes to the phrase "lines of sight comparable"—the "legal base upon

which the rule rests." *United Technologies v. EPA,* 821 F.2d 714, 719–20 (D.C.Cir.1987). In this case, even "in the absence of the [interpretation] there would [ ] be an adequate [regulatory] basis for enforcement action to … ensure the performance of duties." *American Mining Congress,* 995 F.2d at 1112. In other words, the government arguably could have relied on the regulation itself, even without the manual interpretation, to seek lines of sight over standing spectators. In sum, we believe the manual interpretation is not sufficiently distinct or additive to the regulation to require notice and comment.

## III.

In their cross-appeal, appellees contend that the district judge erred in holding that only "substantial" compliance with the Department's regulation is required of arena builders. It will be recalled that the district judge's final order called for 75–88% of wheelchair seating to be provided with a view over standing spectators. Appellees' argument stems not from its own interpretation of the regulation, but rather from its claim that the *Department* interprets the regulation to require 100% compliance. The district court, we are told, should have deferred in this respect to the Department's interpretation of its regulation just as it did regarding the meaning of the phrase "lines of sight comparable."

The difficulty with appellees' argument is that the government never indicated in the manual whether every single wheelchair location must be afforded a view over standing spectators, and the district judge thought there was some practical tension between the lines of sight requirement and the companion requirement in the regulation that wheelchair seating be dispersed (yet integrated with other seating) throughout the facility.[7] Indeed, the Department had indicated in letters from its trial attorneys and a document

7. The manual itself suggests that lines of sight over standing spectators may be provided at the expense of integration: such lines of sight "can be accomplished in many ways, including placing wheelchair locations at the front of a seating section, or by providing sufficient elevation for wheelchair locations placed at the rear of seating sections to allow those spectators to see over the spectators who stand in front of them." The district court noted that "[i]f anything, [appellees] have argued that the seating is too integrated, and that lines of sight have suffered from the failure to place wheelchair spaces further above those seats in front of them."

called a 1996 Accessible Stadium Memorandum that unobstructed sightlines are required only at "all or substantially all" wheelchair locations. And in a settlement reached with the organizers of the Atlanta Olympics, the Department agreed that "substantially all" wheelchair locations would provide unobstructed sightlines; this after advising the organizers that Justice would not agree to settle unless "at least a reasonable number" of the wheelchair seats had lines of sight over standing spectators.

Appellees contend that the district judge misunderstood the Department's official position because he erroneously refused to permit the Department to file a second *amicus* brief which explained—as the Department has before us—that the Department permits substantial compliance only where (1) 100% compliance is structurally impractical or technically infeasible, or (2) where standing spectators' views are obstructed by *other* standing spectators. Appellees dismiss the district court's reliance on the Atlanta settlement, because it was merely an exercise of enforcement discretion with no precedential value.

Although there are circumstances in which a federal court may accept an agency's interpretation of a statute or regulation set forth only in an *amicus* brief, *see Auer*, — U.S. at ——–——, 117 S.Ct. at 911–12 (1997); *compare Church of Scientology v. IRS*, 792 F.2d 153, 162 n. 4 (D.C.Cir.1986) (en banc), *aff'd*, 484 U.S. 9, 108 S.Ct. 271, 98 L.Ed.2d 228 (1987), *with id.* at 165–66 (Silberman, J., concurring), it is not clear here that the Department, which has the authority and duty to issue technical assistance manuals interpreting and applying its regulation, can further add to its interpretation in litigation—and get deference to that marginally additional interpretation. *Cf. General Elec. Co. v. EPA*, 53 F.3d 1324, 1329 (D.C.Cir. 1995). In any event, a federal district court, unlike a court of appeals, *see* FED. R.APP. P. 29, is not obliged to accept an *amicus* brief from the government, let alone a second one purporting to refine arguments that could have been presented in its first. In this case, an understandably exasperated district judge, who had repeatedly asked the government to come into the case as an intervenor, was surely within his discretion in rejecting the second *amicus* brief. Without that brief, we do not see that appellees had much of an argument and they certainly may not improve their position by relying on the government's *amicus* brief on appeal. This is not a case of "agency action," the review of which is strictly a question of law. *See Marshall County Health Care Auth. v. Shalala*, 988 F.2d 1221, 1225 (D.C.Cir.1993). Appellees came into federal court as a private party seeking equitable relief. Under the circumstances, we think the district judge was more than justified in concluding there was a good deal of wiggle room in the degree of compliance contemplated by the regulation and manual, and that he, as a judge sitting in equity, had ample discretion to fashion the remedial order that he did.

Appellees (and the government) complain that to affirm the district court on this point would encourage disuniformity of interpretation of the regulation. That argument overlooks the Department of Justice's authority to put out an amendment to the manual which clarifies its position. Perhaps the government really would like to preserve a certain flexibility, which may explain why it refused to come in as intervenor. But the government cannot have it both ways; if it wishes uniformity in treatment, it certainly has the legal tools to accomplish that result.

The judgment of the district court is affirmed.