# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 15, 2008  Decided December 23, 2008

No. 07-5299

DEVON ENERGY CORPORATION,
APPELLANT

v.

DIRK KEMPTHORNE, SECRETARY OF THE INTERIOR,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 04cv00821)

———

*Deborah B. Haglund* argued the cause for appellant. With her on the briefs was *Charles D. Tetrault*.

*Erik Milito* and *Michele Schoeppe* were on the brief for *amicus curiae* American Petroleum Institute in support of appellant.

*Sambhav N. Sankar*, Attorney, U.S. Department of Justice, argued the cause for appellee. With him on the brief was *Michael T. Gray*, Attorney. *R. Craig Lawrence*, Assistant U.S. Attorney, entered an appearance.

Before: BROWN, *Circuit Judge*, and EDWARDS and SILBERMAN, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: The United States leases the rights to extract and sell natural gas from lands owned by the Government. In exchange, lessees, like appellant Devon Energy Corporation ("Devon"), agree to pay the United States royalties on the natural gas they are able to produce. This case arises from a final order issued by the United States Department of the Interior ("DOI" or "Interior") requiring Devon retroactively to recalculate royalties owed to the Government pursuant to its lease to extract coalbed methane from federal land in Wyoming.

At issue is the agency's interpretation of its "marketable condition rule." The rule was included as a part of DOI's 1988 Revision of Gas Royalty Valuation Regulations, which establish the framework for calculating the royalty value of coalbed methane gas production. In its disputed order, DOI held that the marketable condition rule precluded Devon from deducting certain costs associated with compression and dehydration when calculating the "gross proceeds" upon which royalties are owed. DOI determined that gas cannot enter a pipeline and move to a purchaser unless it meets the requirements of the pipeline, which typically requires compression to raise its pressure and dehydration to reduce its water content. Thus, DOI concluded that if gas is not sufficiently compressed and dehydrated to be deliverable to the point of purchase through the pipeline, it is not in marketable condition. Devon filed suit in the District Court to challenge Interior's order. The District Court denied Devon's motion for summary judgment and granted the Secretary's cross-motion. On appeal, Devon argues that DOI's order is inconsistent with the plain language of the marketable condition rule, and also inconsistent with DOI's own prior interpretation of the rule.

We affirm the judgment of the District Court. First, we find that Interior's interpretation of the marketable condition rule

reflects a perfectly reasonable construction of the rule. It is clear that the agency's order is not at odds with the plain language of the rule, nor does it effectively "amend," rather than reasonably construe, the rule. Second, we reject Devon's claim that DOI's order conflicts with a prior interpretation of the marketable condition rule. Devon argues that its position finds support in guidance documents distributed by agency personnel after DOI's promulgation of the 1988 regulations. However, as Devon concedes, these contested guidance documents were distributed by agency individuals who had no authority either to amend the marketable condition rule or to issue authoritative guidelines on behalf of the agency.

## I. BACKGROUND

### A. *Statutory and Regulatory Framework*

Through its Minerals Management Service ("MMS"), Interior issues and administers leases authorizing the removal of natural gas from federal land. The Mineral Leasing Act, 30 U.S.C. §§ 181 *et seq.* (2000), "was intended to promote wise development of these natural resources and to obtain for the public a reasonable financial return on assets that 'belong' to the public." *California Co. v. Udall*, 296 F.2d 384, 388 (D.C. Cir. 1961). Under the Mineral Leasing Act, the producer-lessees must pay the government-lessor "a royalty at a rate of not less than 12.5 percent in amount or value of the production removed or sold from the lease." 30 U.S.C. § 226(b)(1)(A). In the Federal Oil and Gas Royalty Management Act, the Secretary of the Interior was instructed by Congress to create a comprehensive inspection, collection, accounting, and auditing system to ensure that the government receives the royalties owed. 30 U.S.C. § 1711(a) (1982).

The Mineral Leasing Act gives DOI the authority "to prescribe necessary and proper rules and regulations and to do any and all things necessary to carry out and accomplish the

purposes of" the Act. 30 U.S.C. § 189. Pursuant to this directive, DOI has issued a number of regulations governing the royalty valuation process. In 1988, DOI conducted a major rulemaking that modified the then-existing gas royalty valuation regulations. *See* Revision of Gas Royalty Valuation Regulations and Related Topics, 53 Fed. Reg. 1230, 1272 (Jan. 15, 1988); 30 C.F.R. § 206.152 (1988). The 1988 regulations establish the framework for calculating the royalty value of the coalbed methane gas production at issue here. Under this regulatory framework, royalties are calculated on the basis of the total value a lessee receives for its production. The regulations specify that the "value of production" should be no less "than the gross proceeds accruing to the lessee for lease production," minus certain allowable deductions. 30 C.F.R. § 206.152(h); *see also Amoco Prod. Co. v. Watson*, 410 F.3d 722, 725 (D.C. Cir. 2005), *aff'd sub nom.*, *BP Am. Prod. Co. v. Burton*, 549 U.S. 84 (2006).

When calculating "gross proceeds," DOI regulations have long interpreted the Mineral Leasing Act to require lessees to put the gas into marketable condition at no cost to the United States – the so-called "marketable condition rule." The 1988 regulations confirmed this requirement. *See* 30 C.F.R. § 206.152(i) (governing unprocessed gas); 30 C.F.R. § 206.153(i) (governing processed gas); *see also California Co.*, 296 F.2d at 387-88 (affirming marketable condition requirement). Marketable condition is defined in the DOI regulations as "lease products which are sufficiently free from impurities and otherwise in a condition that they will be accepted by a purchaser under a sales contract typical for the field or area." 30 C.F.R. § 206.151. If a lessee sells "unmarketable" gas at a lower price, the gross proceeds are "increased to the extent that the gross proceeds have been reduced because the purchaser, or any other person, is providing certain services" to place the gas in marketable condition. 30 C.F.R. § 206.152(i); *Amoco*, 410 F.3d at 725-26.

The 1988 regulations also provide that the lessee may deduct its actual costs of transporting the gas from the wellhead to the point of sale when gas produced from the lease is sold at a market remote from the lease. 30 C.F.R. § 206.157(a)-(b). This "transportation allowance" includes "only those costs which are directly related to the transportation of lease production." 53 Fed. Reg. at 1261. A transportation allowance is defined as "an allowance for the reasonable, actual costs of moving [gas] to a point of sale or delivery off the lease . . . or away from a processing plant." 30 C.F.R. § 206.151.

## B. *Facts and Proceedings Below*

Devon leases land from the United States in Wyoming's Powder River Basin, which contains the natural gas known as coalbed methane. These leases cover three fields – Kitty, Spotted Horse, and Rough Draw – each of which contains a large number of individual gas-producing wells. The gas produced from the wells is gathered at central delivery points ("CDPs") that have been approved by the Bureau of Land Management as the points of measure for the royalty due on the gas. After the gas leaves a CDP, it goes through a complex series of compression and dehydration processes as it travels "downstream" to the Buckshot processing plant in preparation for eventual sale. *See* Valuation Determination for Coalbed Methane Production from the Kitty, Spotted Horse, and Rough Draw Fields, *reprinted in* Joint Appendix ("J.A.") 57 ("Valuation Determination"); *see also* Chart, J.A. 460.

The production process varies slightly in the three fields, but the differences are not material. Essentially, each CDP is connected to a small diameter pipeline. Gas travels from the CDP through the pipeline to one of several "screw compressors," which compress the gas to raise its pressure. The gas then travels through the pipeline to a "field booster," a reciprocating compressor that further raises the pressure of the gas. The gas then enters a dehydrator, which removes water.

Valuation Determination, J.A. 61. At this point, the gas enters a 24-inch high-pressure gas pipeline, which begins at what is known as the Landeck Station and runs 126 miles to the Buckshot Gas Plant. Approximately 30 miles from the Landeck Station, the gas enters a large compressor called the "MTG Booster," which compresses the gas to raise the pressure from 450-500 pounds per square inch ("psi") to approximately 1,200 psi. The gas travels the remaining 96 miles to the Buckshot Gas Plant, losing approximately one-third of its pressure on the way. *Id*. at 66.

When the gas arrives at the Buckshot Gas Plant, excess carbon dioxide is removed, the gas is dehydrated, and the gas is compressed from approximately 800 psi to 1,100 psi. At that pressure, Devon delivers the treated gas into one of two lateral pipelines. The gas is transported to various purchasers through these pipelines. *Id*.

On November 2, 1995, DOI and MMS personnel serving on a group called the Royalty Policy Board met to discuss how the royalty calculation regulations should be applied to coalbed methane production. *See* Royalty Policy Board Meeting Minutes, Nov. 2, 1995, *reprinted in* J.A. 102. Subsequently, on December 7, 1995, and December 8, 1995, the then-Deputy Director of MMS issued two documents captioned "Coalbed Methane Valuation and Reporting Guidelines" and "Compression Guidance," respectively. *See* Coalbed Methane Valuation and Reporting Guidelines, Dec. 7, 1995, *reprinted in* J.A. 157; Compression Guidance, Dec. 8, 1995, *reprinted in* J.A. 160 [hereinafter, along with the "Dear Operator" letter, *infra*, "guidance documents"]. These documents were memoranda from the Deputy Director to the Associate Director for Royalty Management and the Associate Director for Policy and Management Improvement. J.A. 83. Although they were not promulgated pursuant to the notice-and-comment procedures of the Administrative Procedure Act ("APA"), 5 U.S.C. § 553

(2000), the guidance documents nonetheless suggested that certain costs of compression and dehydration after the gas leaves the CDP were deductible as transportation costs.

Subsequently, on April 22, 1996, MMS's Associate Director for Royalty Management distributed a "Dear Operator" letter detailing how to calculate royalties on coalbed methane production. The letter stated:

> If you sell your coalbed methane at the tailgate of a carbon dioxide removal or other treating facility . . . [y]ou can include costs of dehydration occurring after metering at the royalty measurement point in your transportation allowance but you cannot deduct costs of dehydration occurring at the wellhead. You can include costs for compression occurring downstream of the royalty measurement point, to the extent the compression is necessary for transportation. This includes compression at the CDP and in the transportation system to the [carbon dioxide] removal facility.

MMS Dear Operator Letter, Apr. 22, 1996, *reprinted in* J.A. 162, 164 [hereinafter, along with the "Coalbed Methane Valuation and Reporting Guidelines" and the "Compression Guidance," *supra*, "guidance documents"].

From 1995 to 2002, Devon deducted the following costs as transportation allowances: the cost of compressing the gas at the screw compressors, the field boosters, the MTG Booster, and the Buckshot Gas Plant, as well as the cost of dehydrating the gas. Devon apparently assumed that these expenses were deductible transportation costs under the guidance documents. On January 11, 2002, however, Devon sought guidance from MMS to confirm that it was properly deducting (as part of its transportation allowance) dehydration and compression costs incurred after the gas leaves the CDPs. Request for Valuation Determination, Jan. 11, 2003, *reprinted in* J.A. 166. On October 9, 2003, the Acting Assistant Secretary issued a decision

rejecting Devon's reliance on the guidance documents. *See* Valuation Determination, J.A. 57.

In its Valuation Determination, the agency found that statements in the guidance documents were either ambiguous, J.A. 84-85, or reflected an incorrect application of the marketable condition rule, J.A. 84, or were simply "inconsistent" with the rule, J.A. 85. The DOI Valuation Determination held that Devon's deductions of the costs of dehydration and of compression performed at the screw compressors, the reciprocating compressors, and the Buckshot Plant were inconsistent with the marketable condition rule, because the compression and dehydration functions were necessary to put the production into marketable condition.

> Devon could not meet the requirements of any of its sales contracts without compressing the gas to the pressure necessary to get it into those [pipe]lines . . . . That is the pressure that would enable the gas to be "accepted by a purchaser under a sales contract typical for the field or area," in the words of the definition [of the marketable condition rule] at 30 C.F.R. § 206.151. In other words, to meet the requirements of the "sales contract[s] typical for the field or area," Devon had to compress the gas to pipeline pressure.

*Id*. at 88.

> Both before and after the 1988 regulations, the lessee's obligation is to dehydrate gas to the water content required for delivery to the pipeline (as necessary for sale under contracts that are typical for the disposition of gas produced from the field or area). . . .
>
> Devon has not shown that the dehydration performed after the reciprocating compressors and at the Buckshot Plant is for anything other than what is required to put the

production into marketable condition and what is necessary for it to meet pipeline and purchaser requirements.

*Id*. at 91.

Devon's request for reconsideration of the DOI Valuation Determination was denied in March 2004. Final Order to Perform Restructured Accounting and Pay Additional Royalties ("Final Order"), Mar. 19, 2004, *reprinted in* J.A. 46. The DOI Final Order largely reaffirmed the reasoning and conclusions reached in the DOI Valuation Determination. Devon was instructed to "perform a restructured accounting and pay additional royalties on the coalbed methane produced from the Federal leases" that were the subject of the DOI Valuation Determination. J.A. 55. Devon was also instructed that, in the future, it was to "report and pay royalties under the regulations and guidelines discussed" in the DOI Final Order. *Id*.

Devon filed suit in the District Court seeking to overturn the Final Order. The District Court denied Devon's motion for summary judgment and granted Interior's cross-motion for summary judgment. *Devon Energy Corp. v. Norton*, No 04-Civ-0821, 2007 WL 2422005 (D.D.C. Aug. 23, 2007). This appeal followed.

## II. Analysis

### A. *Standard of Review*

"In a case like the instant one, in which the District Court reviewed an agency action under the APA [5 U.S.C. § 706], we review the administrative action directly, according no particular deference to the judgment of the District Court." *Holland v. Nat'l Mining Ass'n*, 309 F.3d 808, 814 (D.C. Cir. 2002); *see also Troy Corp. v. Browner*, 120 F.3d 277, 281 (D.C. Cir. 1997); *Gas Appliance Mfrs. Ass'n, Inc. v. Dep't of Energy*, 998 F.2d 1041, 1045 (D.C. Cir. 1993). We will uphold the contested agency action unless we find it to be "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

An agency's interpretation of its own regulation is entitled to "substantial deference," unless "plainly erroneous or inconsistent with the regulation." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (internal quotation marks omitted). However, an agency may not "evade [the] notice and comment requirements [of § 553 of the APA, 5 U.S.C. § 553(b)(A),] by amending a rule under the guise of reinterpreting it." *Envtl. Integrity Project v. EPA*, 425 F.3d 992, 995 (D.C. Cir. 2006) (quoting *Molycorp, Inc. v. EPA*, 197 F.3d 543, 546 (D.C. Cir. 1999)); *see also Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1044-48, 1052-57 (D.C. Cir. 1987). In determining whether an agency action effectively "amends" a rule without adhering to the requirements of the APA, we must consider, *inter alia*, whether the agency officials involved in the disputed actions had the authority to issue binding regulations or otherwise act with the force of law on behalf of the agency. *See generally* HARRY T. EDWARDS & LINDA A. ELLIOTT, FEDERAL STANDARDS OF REVIEW – REVIEW OF DISTRICT COURT DECISIONS AND AGENCY ACTIONS 130-35 (2007).

## B. *Plain Language*

Under the 1988 DOI regulations, "marketable condition" is defined to mean "lease products which are sufficiently free from impurities and otherwise in a condition that they will be accepted by a purchaser under a sales contract typical for the field or area." 30 C.F.R. § 206.151. The marketable condition rule requires lessees to put gas into marketable condition at no cost to the United States. At issue here is DOI's interpretation of the rule to include the costs of compression and dehydration incurred after the gas leaves the CDPs to allow it to move through the pipelines that serve the market in which the gas is typically sold. Devon argues that this interpretation is inconsistent with the plain language of the regulations, because

it improperly focuses the inquiry on the market where the gas is actually sold, as opposed to the requirements of a sales contract typical for the field or area.

In its Valuation Determination and Final Order, DOI held that costs associated with compression and dehydration are not deductible if their primary function is to prepare the gas to move through the pipelines to the point where gas is purchased. However, the parties disagree as to what "sales contract typical for the field or area" requires. DOI found that "typical" sales contracts require that gas be delivered to the purchaser at the terminus of a specified pipeline. Under this view, a producer must provide the compression and dehydration necessary to allow the gas to be delivered through the pipeline. Therefore, the agency reasonably found that Devon "could not meet the requirements of any of its sales contracts without compressing the gas to the pressure necessary to get it into" the pipelines, J.A. 88, and that Devon had "not shown that the dehydration performed . . . [was] for anything other than what is required to put the production into marketable condition . . . to meet pipeline and purchaser requirements." J.A. 91.

It is true that the DOI marketable condition rule is ambiguous, and Devon's preferred interpretation of the rule is not unreasonable. In other words, we assume that the costs of dehydration and compression can reasonably be interpreted to fall within the compass of "transportation costs." However, we are obliged to afford "substantial deference to an agency's interpretation of its own regulations." *Thomas Jefferson Univ.*, 512 U.S. at 512 (citations omitted). On this record, we find that DOI's contested construction of the marketable condition rule is reasonable. Indeed, DOI's interpretation of the marketable condition rule is consistent with an interpretation that this court approved in *Amoco*, 410 F.3d 722.

In *Amoco*, we addressed DOI's interpretation of the marketable condition rule as it related to the cost of transporting

excess carbon dioxide to the treatment plant. The court held that the marketable condition rule did not require DOI to "understand typical sales contracts – and thus marketable condition – as relating to transactions at the leasehold or immediately nearby." *Id*. at 729. "The regulation stipulating that producers are to place gas in marketable condition at no cost to the government does not contain a geographic limit." *Id.* Therefore, DOI's interpretation of the marketable condition rule to require lessees to compress and dehydrate gas to meet the requirements of the pipelines that serve its typical purchasers is not "plainly erroneous or inconsistent with the regulation." *Thomas Jefferson Univ*., 512 U.S. at 512. And as the court noted in *Amoco*, the deference that we owe to an agency's interpretation of its own regulations "is particularly appropriate in the context of a complex and highly technical regulatory program, in which the identification and classification of relevant criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns." 410 F.3d at 729 (citations and quotations omitted).

## C. *The Requirements of a Typical Sales Contract*

Devon argues that there is no record support for the agency's conclusion that the typical sales contract for the field or area required Devon to compress its gas to 1,100 psi and dehydrate it in order to put the gas in marketable condition. However, although DOI provided Devon an opportunity to supplement the record after the first valuation determination, Devon merely asserted that it "believes that its working interest partner, Redstone Resources, Inc., sells gas to unrelated third parties in the field at pressures less than 1200 psi [sic] under contracts typical for the field or area." Request for Reconsideration and/or Clarification, *reprinted in* J.A. 194, 196. This cursory assertion is not sufficient to render DOI's interpretation unreasonable.

**D.** *Prior Inconsistent Interpretation*

Finally, Devon argues that the agency's interpretation of the marketable condition rule (embodied in the DOI Valuation Determination and Final Order) must be vacated because it was issued without notice-and-comment rulemaking required by § 553 of the APA. At bottom, Devon's central claim is that it acted in reliance on the guidance documents and this "reliance interest is protected by the APA." Appellant's Br. at 16. Devon's argument runs as follows:

> The marketable condition rule does not prohibit the deduction of transportation costs, and it does not attempt to differentiate between deductible transportation costs and nondeductible marketable condition costs. Because the regulations do not expressly address the issue, the Royalty Policy Board was called upon to interpret the regulations. [*Id.*]

> [The Board's] decision gave rise to [the guidance documents] which were consistently followed by Interior from 1995 until 2003. [*Id.*]

> Devon followed Interior's publicly-announced guidelines and instructions when it deducted its post-CDP dehydration and compression costs. [*Id.*]

> Interior's decision in this case wrongly assumes that Interior was not bound by its 1995 guidelines and instructions because they were not embodied in a formal regulation. This Court has long recognized that an agency interpretation can be authoritatively adopted even if it was not embodied in a rule that was adopted through a notice and comment rulemaking. [*Id.* at 17.]

> An agency's consistent advice – and here it was instruction – to the regulated community can evidence the agency's authoritative adoption of a regulatory interpretation. Such

an interpretation can be changed only through a notice and comment rulemaking. [*Id.*]

DOI's description of the situation is quite different. According to the agency, there was no official or binding Royalty Policy Board action taken to address the issues now before the court. Rather, DOI contends that

[n]otice and comment rulemaking was . . . not required for Interior to change its interpretation of its regulation from how it had been applied as a result of ambiguous guidance documents. This Court has held that the very same guidance documents were not binding on the agency. [*See Amoco*, 410 F.3d at 732.] If they were not binding, then they are not evidence of a definitive agency interpretation and Interior can change its interpretation without going through notice and comment rulemaking. . . . Absent a definitive interpretation, the APA does not require notice and comment rulemaking to effect a change in that interpretation.

Appellee's Br. at 15-16. For the reasons stated below, we agree with DOI.

First, it is telling that the agency's disputed Valuation Determination and Final Order came only after Devon sought confirmation from the agency that it was properly deducting the dehydration and compression costs (as part of its transportation allowance) incurred after the gas leaves the CDPs. This request for confirmation was made in 2002, long after the issuance of the guidance documents upon which Devon now relies. It is perplexing, to say the least, that Devon was seemingly confused over the propriety of its royalty accounting if, in its view, the matters at issue had been authoritatively resolved over five years earlier. In other words, there is much force to DOI's argument that, in fact, the guidance documents were far from conclusive in what they said.

Second, implicit in Devon's prior-inconsistent-interpretation argument is a claim that the judgments reached in DOI's Valuation Determination and Final Order do not reflect a supportable interpretation of the marketable condition rule. As we have already explained in part II.B, *supra*, we find no merit in this claim. Although the marketable condition rule is ambiguous and Devon's preferred construction of the rule is not unreasonable, we are obliged to defer to the agency's reasonable construction of the rule. *Thomas Jefferson Univ.*, 512 U.S. at 512 (holding that an agency's interpretation of its own regulation is entitled to "substantial deference," unless "plainly erroneous or inconsistent with the regulation").

Third, and most important, Devon is mistaken in its argument that the guidance documents constituted authoritative and binding interpretations of the marketable condition rule. In rejecting Devon's argument, we start with the principle that agency actions do not have the force of law unless they "mark the consummation of the agency's decisionmaking process" and either determine "rights or obligations" or result in discernible "legal consequences" for regulated parties. *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). The "Dear Operator" letter certainly does not satisfy this standard. Indeed, this court has previously considered a different aspect of the very same "Dear Operator" letter that is at issue in this case. *See Amoco*, 410 F.3d at 732.

In *Amoco*, coalbed methane producers challenged an Assistant Secretary's decision that cited the April 22, 1996 letter, arguing that it constituted a new rule that the agency could promulgate only through notice-and-comment rulemaking. Citing *Independent Petroleum Ass'n of America v. Babbitt*, 92 F.3d 1248, 1256-57 (D.C. Cir. 1996), the court rejected Amoco's argument because the letter was not binding on the agency:

As in *Babbitt*, the Payor Letter here is not an agency statement with future effect because nothing under DOI regulations vests the Letter's author – in *Babbitt* and this case MMS's Associate Director for Royalty Management – with the authority to announce rules binding on DOI. *Id.* at 1256. "The letter is not an agency rule at all, legislative or otherwise, because it does not purport to, nor is it capable of, binding the agency." *Id.* at 1257.

. . . .

The sort of "workaday advice letter[s] that agencies prepare countless times per year in dealing with the regulated community," *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (internal quotation marks omitted), do not retroactively become agency rules whenever they are referenced in an agency decision.

*Amoco*, 410 F.3d at 732.

In response to the *Amoco* holding, Devon says that it "does not contend that the 1996 Dear Operator letter in and of itself was a binding rule. Rather, Devon contends that the regulatory interpretation it relied on was authoritatively adopted by the agency through the cumulative effect of a number of agency actions, including but not limited to, the issuance of the 1996 Dear Operator letter." Devon Reply Br. at 14. There are two problems with this argument. First, it assumes that the two internal memoranda written by the Deputy Director of the Minerals Management Service in 1995 to the Associate Director for Royalty Management and the Associate Director for Policy and Management Improvement were final and binding agency interpretations of the marketable condition rule. Second, it assumes that the guidance documents have the force of law because Devon followed the advice contained in the documents. There is no merit to these contentions.

Devon argues that these 1995 documents were conclusive because they reflected the actions of the Royalty Policy Board, as if to suggest that the Board had authority to adopt regulations or guidelines that bind the agency. But when questioned about this at oral argument, Devon's counsel readily conceded that the Royalty Policy Board had no authority to issue authoritative guidelines, and that the guideline documents did not have the force of law. This concession is unsurprising, because there is *nothing* in the record here to indicate that the guidance documents purported to have the force of law.

At the very least, a definitive and binding statement on behalf of the agency must come from a source with the authority to bind the agency. *See Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 810 (D.C. Cir. 2006) (holding that Associate Administrator for Safety Assurance had no authority to issue guidelines with binding effect on agency); *Ass'n of Am. R.Rs. v. DOT*, 198 F.3d 944, 948 (D.C. Cir. 1999) (holding a letter and two emails from lower level officials did not amount to an authoritative agency interpretation); *Paralyzed Veterans of Am. v. D.C. Arena L.P.*, 117 F.3d 579, 587 (D.C. Cir. 1997) (stating that a speech of a mid-level official of an agency "is not the sort of 'fair and considered judgment' that can be thought of as an authoritative departmental position") (citing *Auer v. Robbins*, 519 U.S. 452, 462 (1997)); *Amoco*, 410 F.3d at 732 (noting "Dear Operator" letter not binding on agency because not authored by official with authority to announce binding rules). The guidance documents at issue here do not satisfy this standard.

Fourth, resting on its "reliance" theory, Devon suggests that the agency is bound by the guidance documents because, for a number of years, regulated parties followed the advice contained in the documents. This argument fails. In *Center for Auto Safety*, 452 F.3d 798, a case very much on point, the court held that policy guidelines issued by the Associate Administrator of

the National Highway Traffic Safety Administration did not amount to a binding rule. The contested guidelines, which related to automakers' voluntary regional recalls, were found not binding because the Associate Administrator had no authority to issue binding regulations or make a final determination on the issue. Importantly, the court also rejected the petitioner's argument that, merely because the agency and automakers had followed the guidelines for seven years, the guidelines had binding "legal consequences." In addressing this point, the court said:

> The flaw in appellants' argument is that the "consequences" to which they allude are practical, not legal. It may be that, to the extent that they actually prescribe anything, the agency's guidelines have been voluntarily followed by automakers and have become a de facto industry standard for how to conduct regional recalls. But this does not demonstrate that the guidelines have had *legal consequences*. The Supreme Court's decision in *Bennett* makes it quite clear that agency action is only final if it determines "rights or obligations" or occasions "*legal* consequences." 520 U.S. at 178. (citation and internal quotation marks omitted). Circuit case law cannot obviate the holding of *Bennett*.

*Ctr. for Auto Safety*, 452 F.3d at 811. *See also Nat'l Ass'n of Home Builders v. Norton*, 415 F.3d 8, 15 (D.C. Cir. 2005) ("[I]f the practical effect of the agency action is not a certain change in the legal obligations of a party, the action is non-final for the purpose of judicial review.").

Devon argues that our decisions in *Alaska Professional Hunters Ass'n v. FAA*, 177 F.3d 1030 (D.C. Cir. 1999), and *Paralyzed Veterans of America*, 117 F.3d 579, should control the disposition of this case. We disagree. In *Alaska Professional*, the court found that thirty years of uniform advice by the Alaskan regional office of the FAA "became an

authoritative departmental interpretation" binding on the agency. The case is plainly distinguishable, however, because the disputed agency advice in that case had been upheld in a formal adjudication by the Civil Aeronautics Board, FAA's predecessor agency. *See Alaska Prof'l*, 177 F.3d at 1034 (discussing *Administrator v. Marshall*, 39 C.A.B. 948 (1963)). Indeed, the decision in *Alaska Professional* acknowledges that an interpretation or advice by an official without authority to bind the agency alone would not amount to an authoritative interpretation. *Alaska Prof'l*, 177 F.3d at 1035; *see also Hudson v. FAA*, 192 F.3d 1030, 1036 (D.C. Cir. 1999) (distinguishing *Alaska Professional* as concerning a binding interpretation on the basis of the formal adjudication upon which the longstanding practice was based); *Ass'n of Am. R.Rs.*, 198 F.3d at 949 (same). In this case, by contrast, the guidance documents have never been upheld in an agency adjudication, nor have they ever been endorsed in any other agency action having the force of law.

*Paralyzed Veterans* also lends no support to Devon's position. In that case, we held that Advisory Board guidelines that were not clearly adopted by the Department of Justice and a speech by a mid-level official did not amount to a binding interpretation of its regulation implementing the Americans with Disabilities Act. 117 F.3d at 588. The court noted that if the Department itself had adopted the Board's interpretation of the regulation the outcome might have been different. *Id*. The case surely does not stand for the proposition that guidance documents written by persons without authority to bind an agency and released with no indication that the documents purported to have the force of law may be taken as binding interpretations of an agency regulation.

In sum, we find no merit in Devon's claim that it acted in reliance on the 1995 and 1996 guidance documents and that this "reliance interest is protected by the APA." As noted above, the guidance documents were far from conclusive in what they said.

In any event, on the record here, it is plain that the contested guidance documents did not come from sources who had the authority to bind the agency. Therefore, it does not matter whether the appellant, or others, followed the advice that was offered in these documents. These documents did not amount to a binding interpretation of the marketable condition rule, so the Agency was free to adopt the interpretation at issue in this case without providing an opportunity for notice and comment.

### III. CONCLUSION

For the reasons indicated above, we deny Devon's challenge to DOI's Final Order and affirm the District Court's judgment in favor of the agency.