**GUARD, Petitioner,**

v.

**UNITED STATES NUCLEAR REGULATORY COMMISSION, Respondent,**

**Southern California Edison Company, et al., Intervenors.**

**No. 84–1091.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 19, 1984.

Decided Feb. 12, 1985.

Charles E. McClung, Jr., Laguna Hills, Cal., for petitioner.

Sheldon L. Trubatch, Washington, D.C., with whom E. Leo Slaggie, Acting Sol., Nuclear Regulatory Com'n, Richard L. Black, Nuclear Regulatory Com'n and John A. Bryson, Dept. of Justice, Washington, D.C., were on brief, for respondent.

David R. Pigott, Samuel B. Casey, San Francisco, Cal. and Catherine M. Kelly, Long Beach, Cal., were on the brief, for intervenors Southern Cal. Edison Co., et al.

Before TAMM, GINSBURG and SCALIA, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge.

As a condition for the issuance of a nuclear power reactor operating license, the Nuclear Regulatory Commission (NRC or Commission) must find "that there is reasonable assurance that adequate protective measures can and will be taken in the event of a radiological emergency." 10 C.F.R. § 50.47(a)(1) (1984). To determine whether the needed "assurance" exists, the Commission reviews the license applicant's onsite and offsite emergency response plans for compliance with enumerated standards. *Id.* § 50.47(b). One of the standards specifies that the response plans include "[a]rrangements ... for medical services for contaminated injured individuals." *Id.* § 50.47(b)(12). The instant petition for review concerns a Commission generic interpretation of this "arrangements ... for medical services" standard.

In the course of operating license hearings for San Onofre Nuclear Generating Station (SONGS) Units 2 and 3, the NRC certified two definitional questions regarding section 50.47(b)(12) as that standard bears on the general public.[1] The Commission answered both questions *not* in rela-

---

**1.** Preparations that the NRC's regulation requires *at the nuclear plant site* are not at issue in this case.

tion to the SONGS record, but in a manner designed to give generic guidance. *Southern California Edison Co.*, 17 N.R.C. 528, 530 (1983) [hereafter NRC Decision]. The NRC declared first that emergency response efforts should include consideration not only of "(1) those who become injured and are also contaminated," but also of "(2) those who may be exposed to dangerous levels of radiation." *Id.*[2] However, the Commission thereafter stated that, with respect to the second category of individuals—those who may be exposed to dangerous levels of radiation but are not otherwise injured—emergency plans suffice if they provide simply a list of pre-existing local or regional medical facilities capable of treating radiation exposure. *Id.*[3]

The petition for review questions whether it is rational to qualify, as a form of "arrangements ... made for medical services" for persons "exposed to dangerous levels of radiation," mere identification of whatever facilities happen to exist. We hold that the Commission did not reasonably interpret the section 50.47(b)(12) phrase "arrangements ... made for medical services" when it declared, generically, that a simple list of treatment facilities already in place constitutes such arrangements.

In so ruling, we impose no tight restraint on the NRC's regulatory authority. The Commission, on remand, may concentrate on the SONGS record; it may revisit the question, not now before us for review, of the scope of the section 50.47(b)(12) phrase "contaminated injured individuals"; it may describe genuine "arrangements" for medical services for dangerously exposed members of the general public; or it may pursue any other rational course. It may not, however, interpret the section 50.47(b)(12)

phrase "arrangements ... made for medical services" as meaning something other than what those words, in the context of a nuclear power plant emergency planning standard, may rationally convey.

## I. BACKGROUND

On May 14, 1982, the Atomic Safety and Licensing Board (Licensing Board) authorized full-power operating licenses for SONGS Units 2 and 3, subject to the condition that within six months the applicants, in conformity with the Licensing Board's reading of section 50.47(b)(12), develop appropriate offsite medical arrangements. *Southern California Edison Co.*, 15 N.R.C. 1163, 1187 (1982) [hereafter 1982 Licensing Board Decision]. Applicant Southern California Edison Company, an intervenor here, and the NRC staff had argued before the Licensing Board that section 50.47(b)(12) did not require medical plans for the general public; as they read the provision, it confined required plan coverage to people on, or in the immediate vicinity of, the nuclear plant site (mainly plant personnel and emergency workers from the neighboring community). In keeping with this interpretation, the applicants presented no specific offsite medical plans; instead, they maintained that offsite medical arrangements could be made ad hoc after a nuclear plant accident.

The Licensing Board characterized the applicant/staff reading of section 50.47(b)(12) as "narrow" and not in tune with the prescription's language or the historical context of the emergency planning regulations. *Id.* at 1187–90. In addition to determining that the standard required medical arrangements covering the general public, the Licensing Board clearly stated that it

---

2. It is not before us to determine—and we intimate no view upon—whether an NRC definition of the class "contaminated injured individuals" to exclude individuals falling only within the radiation exposure category would pass muster.

3. The NRC also observed that individuals onsite and offsite who may become both contaminated by radiation and physically injured in some other way are "expected to be very few." *Southern Cal. Edison Co.*, 17 N.R.C. 528, 535 (1983).

The Commission therefore regarded preparations at the nuclear plant site as adequate to accommodate members of the public so affected, and ruled that no additional medical arrangements would be needed for them under § 50.47(b)(12). *Id.* At oral argument petitioner's counsel stated in response to the court's inquiry that petitioner does not challenge this aspect of the NRC decision.

read section 50.47(b)(12) to encompass off-site persons who, even if not otherwise injured, suffer exposure to dangerous levels of radiation. *Id.* at 1197–200 & n. 30. Under the Licensing Board interpretation, the applicants had not made the necessary offsite medical presentation, and would be required to do so as a condition of their licenses.

GUARD (Groups United Against Radiation Danger), an intervenor before the Licensing Board, and petitioner here, requested the Atomic Safety and Licensing Appeal Board (Appeal Board) to stay the Licensing Board's authorization of operating licenses pending appeal of the Licensing Board's decision. The Appeal Board denied the stay. In dictum, the Appeal Board registered its disagreement with the Licensing Board's interpretation of section 50.47(b)(12). The Appeal Board did not advert to any onsite/offsite distinction; it regarded as critical the provision's reference to "contaminated injured individuals" as the targeted group. The Appeal Board interpreted that phrase to mean *only* persons who are both contaminated *and* physically injured in some other manner as well.[4] Based on its understanding that section 50.47(b)(12) does not reach members of the public who suffer only radiation exposure, the Appeal Board agreed with the NRC staff that arrangements for radiation victims could be made ad hoc after an accident. *Southern California Edison Co.,* 16 N.R.C. 127, 136–38 (1982).

The NRC declined to review the Appeal Board's denial of the stay. Noting the disagreement between the Appeal Board and the Licensing Board on the meaning of section 50.47(b)(12), however, the Commission directed certification to it of the following two questions:

(1) Does the phrase "contaminated injured individuals" as used in 10 CFR 50.47(b)(12) require applicants for nuclear power plants to provide arrangements for medical services only for members of the public who have suffered traumatic [physical] injury and are also contaminated with radiation?
(2) If the answer to Question 1 is no, to what extent does 10 CFR 50.47(b)(12) require advance, specific arrangements and commitments for medical services for the general public as opposed to the general knowledge that facilities and resources exist and could be used on an *ad hoc* basis?

*Southern California Edison Co.,* 16 N.R.C. 883, 884 (1982).

Responding to the certified questions, the NRC agreed with the Licensing Board that section 50.47(b)(12) encompassed not only persons who are both physically injured and contaminated, but also members of the general public who suffer only exposure to high levels of radiation. However, the NRC introduced a different view of the "degree of advance planning" required by the standard: it held that treatment for individuals injured only by radiation "can be arranged for on an as-needed basis during an emergency." NRC Decision, 17 N.R.C. at 530. Thus, while the Commission read section 50.47(b)(12) as encompassing radiation exposure victims, it required no more in the way of pre-accident planning for such persons than a list identifying "those local or regional medical facilities which have the capabilities to provide appropriate medical treatment for radiation exposure." *Id.* There would be no need for pre-accident inquiry into the adequacy of existing facilities or advance arrangements with or for any particular facilities. *Id.* Whatever existed would do. The NRC

---

**4.** The Appeal Board defined "contaminated" as having radioactive material on or in one's body. A person may be *exposed* to radiation without having radioactive material on his or her body. Thus there is a significant difference between those who are contaminated by radiation and those who are exposed but not contaminated: persons who are contaminated carry the radioactive material with them, and therefore can spread the dangerous substance; persons who are only exposed pose no threat to others.

The Appeal Board thought that medical arrangements were necessary only for individuals who are contaminated and otherwise injured, because they present the special problem of treating the physical injury without spreading the contamination. *See* Southern Cal.Edison Co., 16 N.R.C. 127, 137 (1982).

staff and the license applicants, we note again, had consistently urged the adequacy of a purely ad hoc response to victims of radiation exposure; like the Appeal Board and unlike the Commission, however, they had pressed that position on the understanding that radiation exposure was *not* covered by the section 50.47(b)(12) emergency planning medical arrangements requirement.

The NRC interpretation of section 50.47(b)(12) was generic. It did not rely on evidence of medical facilities in the vicinity of SONGS, or on any other particulars of the SONGS record. The Commission made it plain that its purpose in posing and responding to the certified questions was to establish guidance applicable not only to SONGS but to all future applications. *See* NRC Decision, 17 N.R.C. at 530 ("[T]he interpretation of the regulation involves a significant issue of policy that affects other plants and proceedings.").

After answering the certified questions, the NRC remanded the case to the Licensing Board. The applicants supplemented the record by submitting a list of appropriate, existing medical facilities in the SONGS area. The Licensing Board held that under the NRC Decision, the applicants had thus fully satisfied section 50.47(b)(12). GUARD asked the Licensing Board to inquire further, to determine whether the facilities listed by the applicants would be adequate in the event of an emergency. The Licensing Board explained that any additional consideration of

medical arrangements would be inconsonant with the NRC's generic disposition:

> [A]s to members of the offsite public who may suffer radiation injuries, a licensing board's proper inquiry is quite narrow—whether existing medical facilities have been identified. . . . Boards are not to go behind the list of existing facilities to determine whether those facilities are adequate (or inadequate) to cope with various accident scenarios in the site-specific setting. . . .
>
> . . . .
>
> . . . Again, as we understand the Commission, the listing of existing facilities—whatever they may be—is to be deemed adequate.

*Southern California Edison Co.,* 18 N.R.C. 228, 232–33 (1983) [hereafter 1983 Licensing Board Decision].

██ GUARD seeks judicial review of the NRC generic interpretation of section 50.47(b)(12), as applied to SONGS by the Licensing Board.[5]

## II. ANALYSIS

██ An agency's interpretation of its own regulation generally warrants a high degree of respect. We have so observed in the specific context of NRC regulations. *See North Anna Environmental Coalition v. NRC,* 533 F.2d 655, 659 (D.C.Cir. 1976).[6] Our deference, however, has limits. Again referring to the NRC, we have stated that our high regard "is appropriate

---

**5.** Intervenor Southern California Edison Company argues that GUARD is time-barred from seeking review of the NRC decision because it did not file a petition in court within 60 days of that decision. *See* 28 U.S.C. § 2344 (1982) (Hobbs Act). The Commission acknowledged at oral argument, however, that any attempt by GUARD to challenge the NRC's purely generic interpretation would have been premature until the guidance was applied to SONGS on remand to the Licensing Board. We agree, and reject intervenor's Hobbs Act argument as meritless.

**6.** GUARD urged diminished deference to the NRC interpretation of § 50.47(b)(12) because the Commission's view is not in agreement with the view of the Federal Emergency Management Agency (FEMA). The regulation containing

§ 50.47(b)(12) tracks the emergency preparedness guidelines developed jointly by FEMA and the NRC after the Three Mile Island nuclear plant accident. NRC & FEMA, CRITERIA FOR PREPARATION AND EVALUATION OF RADIOLOGICAL EMERGENCY RESPONSE PLANS AND PREPAREDNESS IN SUPPORT OF NUCLEAR POWER PLANTS 69 (NUREG–0654/FEMA–REP–1, Nov. 1980).

Because we find that the NRC interpretation conflicts with the plain meaning of § 50.47(b)(12), we need not reach this issue. We note, however, that FEMA's position on the meaning of § 50.47(b)(12) is far from clear. *See* 1982 Licensing Board Decision, 15 N.R.C. at 1193–95 & n. 21; NRC Decision, 17 N.R.C. at 536 n. 12a; 1983 Licensing Board Decision, 18 N.R.C. at 231.

only so long as the agency's interpretation does no violence to the plain meaning of the provision [at issue]." *Deukmejian v. NRC*, 751 F.2d 1287 at 1310 (D.C.Cir.1984); *see Union of Concerned Scientists v. NRC*, 711 F.2d 370, 381 (D.C.Cir.1983). This is a case in which the Commission's interpretation of its own regulation lacks the quality necessary to attract judicial deference.

As we recounted earlier, the NRC began its generic interpretation of section 50.47(b)(12) by determining, in response to a question the Commission itself framed, that the provision covers members of the public exposed to high levels of radiation even if they are not otherwise injured. *See supra* pp. 1146–47. The Commission has not withdrawn that determination and it remains unchallenged in this review proceeding. We express no view on the threshold coverage question thus raised and answered by the NRC. *Cf. Deukmejian*, at 1305–08 (court reviewed NRC ruling that possible complicating effects of an earthquake on emergency planning were not material for purposes of individual licensing proceedings and found that NRC acted within its discretion). Once the NRC placed radiation victims under the protection of section 50.47(b)(12), however, it could not disregard the words used in the regulation to describe the required protection. *Cf. Union of Concerned Scientists v. NRC*, 735 F.2d 1437 (D.C.Cir.1984) (although NRC has broad discretion to determine scope of licensing proceeding, once NRC defines an issue as material to such a proceeding, NRC cannot deny statutory right to a hearing on the issue).

As an emergency planning standard to be met *before* an operating license issues, section 50.47(b)(12) requires that "[a]rrangements be made for medical services for contaminated injured individuals." The Commission interpretation of section 50.47(b)(12), however, allows medical services for radiation exposure to be arranged entirely ad hoc *after* the onset of an emergency. A provision calling for pre-event arrangements is not sensibly met by post-event prescriptions.

The Commission specified only one advance preparation requirement: license applicants must identify appropriate facilities existing in the area. Once an accurate list is composed, the license applicant has satisfied the requirement. Planning in this instance starts and stops with a list. In court, the Commission and intervenors made three attempts to qualify the NRC decision as something other than a mere listing and blanket acceptance of whatever medical facilities happen to exist in the area. These attempts fail.

First, intervenors pointed to evidence of medical facilities in the SONGS record to show that arrangements for radiation exposure in the SONGS area are adequate. Brief for Intervenors at 10–11. Neither the Commission nor the Licensing Board on remand, however, ever reviewed the SONGS record evidence on medical facilities to determine the adequacy of those facilities for the radiation-exposed public. The NRC's generic interpretation rendered such a specific inquiry unnecessary. *See supra* p. 1148. Second, intervenors noted that "the capability of any of the listed ... facilities 'to provide appropriate medical treatment for radiation exposure'" may be challenged. Brief for Intervenors at 46 (quoting NRC Decision, 17 N.R.C. at 537). The NRC interpretation may allow a challenger to question whether a list is *accurate*, but it provides no wedge for any inquiry whether the facilities properly on the list would be *sufficient* in an emergency. *See* 1983 Licensing Board Decision, 18 N.R.C. at 232–33. Third, the Commission suggested that if existing medical facilities in the vicinity of a plant site are not adequate, a *waiver* of section 50.47(b)(12) could be sought *by concerned members of the public. See* 10 C.F.R. § 2.758 (1984); Brief for Respondents at 36. This suggestion virtually concedes that, as construed by the NRC, section 50.47(b)(12) would not itself respond to the possibility that the listed medical facilities may be inadequate.

██ The underlying assumption made by the Commission—that wherever present or

future nuclear power plants may be located, adequate facilities will be available in the area to serve victims of radiation exposure in the event of an accident—is hardly within the core of the Commission's expertise. In any case, it is not an assumption properly indulged in an emergency preparedness regulation. Section 50.47(b) describes the medical arrangement requirement as one of the several "standards" applicants' emergency response plans "must" in fact meet. In effect, the Commission has declared that, as to one category of protected persons (those injured only by exposure to high levels of radiation), the "standard" will be met automatically in every case.[7] It appears, in sum, that the NRC, with one hand, has placed section 50.47(b)'s cover over individuals exposed to dangerous levels of radiation but, with the other hand, has removed the cover.

The Commission's explanation for its position is terse:

> The nature of radiation injury is that, while medical treatment may be eventually required in cases of extreme exposure, the patients are unlikely to need emergency medical care. The non-immediacy of the treatment required for radiation-exposed individuals provides onsite and offsite authorities with an additional period of time to arrange for the required medical service. Thus, any treatment required could be arranged for on an *ad hoc* basis.

NRC Decision, 17 N.R.C. at 535–36 (footnote omitted). One might expect to encounter this reasoning in an opinion explaining why medical arrangements for radiation exposure should not be part of the section 50.47(b)(12) emergency planning

standard. But the NRC has decided that radiation exposure *is* covered by the standard. The above NRC statement provides no explanation at all why a standard demanding medical arrangements *before* an emergency occurs is properly interpreted to mean something quite different. *Cf. New England Coalition on Nuclear Pollution v. NRC*, 727 F.2d 1127, 1130 (D.C.Cir.1984) (it would be irrational for agency to support a rule requiring financial qualifications review for *some* utilities with a statement that all financial qualifications reviews are worthless).

CONCLUSION

For the reasons stated we reject as irrational the NRC's generic interpretation of section 50.47(b)(12) with respect to members of the public exposed to dangerous levels of radiation. Accordingly, we vacate the dispositions on review that state or apply the generic interpretation and remand this matter to the agency for further consideration consistent with this opinion.

*It is so ordered.*

---

7. The Commission attempted to justify its failure to require any medical arrangements for radiation exposure, other than a list of existing facilities, in part with the observation that "[i]t was never the intent of the regulation to require directly or indirectly that state and local governments adopt extraordinary measures, such as construction of additional hospitals or recruitment of substantial additional medical personnel, just to deal with nuclear plant accidents." NRC Decision, 17 N.R.C. at 533. But, as the Licensing Board observed in its 1982 decision, and as GUARD agreed at oral argument, medical arrangements need not require "the construction of hospitals, the purchase of expensive equipment, the stockpiling of medicine—in short, any large expenditure the sole purpose of which would be to guard against a very remote accident. The emphasis, rather, is on developing specific plans and training people to perform medical services." 1982 Licensing Board Decision, 15 N.R.C. at 1200. We think it plain that "medical arrangements" need not be read to require construction of facilities or other extraordinary measures.