United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued October 6, 1999 Decided November 12, 1999 

 No. 99-1002

 National Whistleblower Center, 
 Petitioner

 v.

 Nuclear Regulatory Commission and 
 United States of America, 
 Respondents

 Baltimore Gas and Electric Company, 
 Intervenor

 Consolidated with 
 No. 99-1043

 On Petition for Review of an Order of the 
 Nuclear Regulatory Commission

 Stephen M. Kohn argued the cause for petitioner. With 
him on the briefs was David K. Colapinto.

 Marjorie S. Nordlinger, Attorney, United States Nuclear 
Regulatory Commission, argued the cause for respondent. 
With her on the brief were Karen D. Cyr, General Counsel, 
John F. Cordes, Jr., Solicitor, E. Leo Slaggie, Deputy Solici-
tor, Lois J. Schiffer, Assistant Attorney General, United 
States Department of Justice, and Mark Haag, Attorney.

 David R. Lewis and James B. Hamlin were on the brief 
for intervenor.

 Before: Edwards, Chief Judge, Wald and Williams, 
Circuit Judges.

 Opinion for the Court filed by Circuit Judge Wald.

 Dissenting opinion filed by Circuit Judge Williams.*

 Wald, Circuit Judge: This appeal involves the dismissal by 
the Nuclear Regulatory Commission ("NRC" or "the Com-
mission") of a petition by the National Whistleblower Center, 
a citizens' group ("Whistleblower"), to intervene in the first 
ever license renewal proceeding for a nuclear power plant, in 
this instance Calvert Cliffs. The NRC issued a referral order 
to an Atomic Safety Licensing Board ("Board") which pre-
scribed a streamlined procedure for the proceeding, including 
a shortened time period for Whistleblower to file its conten-
tions. In the referral order, NRC for the first time also 
adopted a stringent interpretation of the "good cause" stan-
dard in its published rules for extending prescribed time 
limits, to henceforth require a showing of "unavoidable and 
extreme circumstances." See NRC Rules of Practice for 
Domestic Licensing Proceedings and Issuance of Orders, 10 
C.F.R. s 2.711 (1999). When Whistleblower asked the Board 
for an extension of time to file its contentions, the Board 
denied its request, applying the "unavoidable and extreme 
circumstances" standard, and the NRC affirmed the decision. 
The NRC subsequently dismissed Whistleblower's petition 
when Whistleblower failed to file contentions within the 
NRC's deadline.

__________
 * Judge Williams' dissent will be filed at a later date.

 Because we conclude that the "unavoidable and extreme 
circumstances" test is effectively an amendment of the Com-
mission's regulations made without notice and comment re-
quired by the Administrative Procedure Act, we vacate the 
Commission's decision dismissing the petition to intervene 
and remand to the agency to consider Whistleblower's motion 
for an extension of time under its prior interpretation of the 
"good cause" standard. Recognizing that much progress has 
been made in processing the Calvert Cliffs renewal applica-
tion since a year ago when the contested events occurred, we 
require only that the Commission provide Whistleblower with 
a meaningful opportunity to submit its contentions. If Whis-
tleblower can show "good cause"--under the Board's prior 
interpretation--for its original request for an extension of 
time to file contentions and the contentions satisfy the agen-
cy's other published criteria, the agency must allow Whistle-
blower to participate meaningfully in the license renewal 
process.

 I. Background

 On July 8, 1998, the NRC published a Notice of Opportuni-
ty for a Hearing in the Federal Register permitting any 
interested person to intervene in the proceeding regarding 
the license renewal application of the Baltimore Gas & Elec-
tric Company ("BG&E") to continue to operate the Calvert 
Cliffs Nuclear Power Plant. The Notice of Receipt of the 
application was published in late April but the application was 
not accepted for docketing until May 19. Whistleblower filed 
a petition to intervene on August 7. The July 8 hearing 
notice contained what the Commission later referred to as 
"ambiguous" language paraphrasing sections 2.714(a)(3) and 
2.714(b)(1) of its published regulations to the effect that any 
petitioner to intervene could amend a petition or supplement 
contentions1 not later than fifteen days before the first pre-

__________
 1 A contention is a specific issue of law or fact which a petitioner 
seeks to have litigated at a hearing. Under NRC rules, a conten-
tion must include a specific statement of the issue of law or fact to 
be argued and the petitioner must support it with a brief explana-

hearing conference. See Baltimore Gas & Elec. Co., Calvert 
Cliffs Nuclear Power Plant, Units 1 & 2; Notice of Opportu-
nity for a Hearing Regarding Renewal of Facility Operating 
License, 63 Fed. Reg. 36,966, 36,966 (1998); 10 C.F.R. 
s 2.714(a)(3), (b)(1). On August 19, however, the NRC re-
ferred the petition to intervene to an Atomic Safety and 
Licensing Board and gave "guidance" to the Board on how to 
conduct the proceeding. Among other things, the referral 
order directed the Board to adopt a streamlined schedule for 
the hearing. Significantly, the order directed that "the Li-
censing Board should not grant requests for extensions of 
time absent unavoidable and extreme circumstances." Joint 
Appendix ("J.A.") at 28. Two days later, Whistleblower filed 
with the Commission a motion to vacate the referral order as 
contrary to the Commission's regulations prescribing exten-
sions of time for "good cause" and allowing contentions to be 
filed fifteen days before an initial prehearing conference. See 
10 C.F.R. ss 2.711(a), 2.714(a)(3), (b)(1). The Commission 
denied the motion on the ground that it has authority to 
shorten the time for filing contentions under section 2.711, 
and that limiting extensions to "unavoidable and extreme 
circumstances" merely gives content to the general "good 
cause" standard.

 On August 20, the Board issued an initial prehearing order 
requiring Whistleblower to file its contentions by September 
11, 1998, and scheduled the first prehearing conference for 
the week of October 13, later specifying October 15. In 
short, Whistleblower was required to file its contentions 
within three weeks after the prehearing order and thirty-four 
days before the prehearing conference. In addition, the 
Board reiterated that any motion for an extension of time 
must "demonstrate 'unavoidable and extreme circumstances' 
that support permitting the extension."

__________
tion of its bases; a short statement of the facts or expert opinion 
which are intended to support it, together with references to the 
specific documents and sources upon which the petitioner will rely 
to establish the facts or opinion; and sufficient information to show 
that a genuine dispute exists between the intervenor and the 
applicant on a material issue. See Rules of Practice for Domestic 
Licensing Proceedings and Issuance of Orders, 10 C.F.R. 
s 2.714(b)(2) (1999).

 The day after the Board's initial prehearing order, Whistle-
blower filed a motion to extend the time for filing contentions 
until mid-November. Whistleblower based the motion on its 
need to retain experts to review the application and to 
provide necessary technical input, the complexity of the 
three-volume relicensing application and the fact that this 
proceeding would inevitably involve novel issues since it was 
the first nuclear power reactor license renewal proceeding 
ever. A week later, on August 27, the Board rejected peti-
tioner's motion for an extension of time, stating that Whistle-
blower failed to meet its burden of establishing "unavoidable 
and extreme circumstances" justifying an extension. Whis-
tleblower petitioned the Commission for interlocutory review 
of the decision and on September 17 the Commission issued 
an order moving the deadline for contentions to September 
30--subsequently extended to October 1 because of a Jewish 
Holiday. The Commission explained its action by saying that 
Whistleblower might not have anticipated such an early date 
for filing contentions since the language in the July 8 notice 
stated that under section 2.714(b)(1), petitioners could file 
contentions not later than fifteen days prior to the first 
prehearing conference. However, the Commission expressed 
general satisfaction with the Board's streamlined agenda for 
the relicensing procedure, concluding that the Board acted 
reasonably in setting an earlier date for filing contentions 
than its published rules provided and in refusing to extend 
the time for filing, and reaffirmed the "unavoidable and 
extreme circumstances" test. In light of the Commission's 
action, the Board subsequently rescheduled the initial pre-
hearing conference for November 12. This meant that Whis-
tleblower had to file its contentions forty-two days before the 
prehearing conference, instead of fifteen days as set out in 
the Commission's rules.

 On October 1, the due date for filing its contentions under 
the Commission's reprieve, Whistleblower filed a status re-
port and a motion to vacate and reschedule the prehearing 
conference. The status report identified the experts that 
Whistleblower had retained, the "areas of concern" in the 
application the experts were studying, and recited various 
alleged defects and omissions in BG&E's license renewal 
application. In the status report and the motion to vacate, 

Whistleblower included numerous references to its argument 
that it had "good cause" for an extension of time. In addi-
tion, Whistleblower asserted in its motion to vacate that the 
Board and Commission improperly and prejudicially applied 
the stringent "unavoidable and extreme circumstances" test 
in rejecting its motion for enlargement of time. However, 
Whistleblower specifically stated that the status report was 
not to be regarded as its contentions.

 On October 13, Whistleblower filed its "first supplemental 
set of contentions." Whistleblower indicated that it retained 
the right to supplement its petition to intervene as provided 
in the Commission's published rules and that it was filing the 
contentions without prejudice to its October 1 motion to 
vacate and reschedule the prehearing conference. The filing 
contained two contentions, one alleging that the renewal 
application was incomplete and must be withdrawn or sum-
marily dismissed and another alleging that the application 
failed to meet aging and other safety-related requirements. 
However, Whistleblower did not allege specific facts to sup-
port these contentions, but rather referred to the Requests 
for Additional Information filed by the NRC staff ("RAIs")2 
as setting forth the bases for each contention. On October 
16, the Board concluded that Whistleblower had neither 
submitted contentions by the October 1 deadline nor demon-
strated that the October 13 contentions met the late-filing 
standards of 10 C.F.R. s 2.714(a);3 accordingly it dismissed 
Whistleblower's petition to intervene.

__________
 2 A Request for Additional Information is a demand by the NRC 
staff for important information not present in a license application. 
During a review of any application by the staff, an applicant may be 
required to supply such additional information. See 10 C.F.R. 
s 2.102(a). An application may be denied if an applicant fails to 
respond to a request for additional information within 30 days from 
the request or any other time specified. See id. s 2.108.

 3 Even if contentions are filed after a deadline for filing, they can 
nonetheless be admitted as late-filed contentions. Late-filed con-
tentions are admitted if the presiding officer makes a finding that 
the contentions satisfy a balancing of factors: good cause for failure 
to file on time; availability of other means to protect the petitioner's 

 The Commission on December 23, 1998 affirmed both the 
Board's decision to reject the motion for an extension of time 
and to dismiss the petition. The Commission said that the 
Board had "good cause" to shorten the normal time provided 
in the written regulations for filing contentions because a 
shorter deadline would make the prehearing conference more 
meaningful by allowing the Board and Whistleblower to con-
sider the NRC staff's answer to the proposed contentions 
prior to the scheduled date of the conference. The Commis-
sion once again approved the Board's use of the "unavoidable 
and extreme circumstances" test to reject Whistleblower's 
motion for an extension of time. It reasoned that the test 
was a "construction of 'good cause' " intended as a "reason-
able means of avoiding undue delay in this important license 
renewal proceeding, and for assuring that the proceeding is 
adjudicated promptly." J.A. at 345-46.

 II. Analysis

 The nub of this controversy is whether NRC's new inter-
pretation of a published regulation amounts to an amendment 
of the regulation requiring notice and comment under the 
Administrative Procedure Act. See 5 U.S.C. s 551(5) (1994). 
Whistleblower argues that the Commission departed from its 
own published rules when it rejected Whistleblower's motion 
for an extension of time to file contentions as failing the 
"extreme and unavoidable circumstances" standard instead of 
continuing to use the "good cause" standard applied in all 
previous requests for extensions. The Commission responds 
that the "unavoidable and extreme circumstances" test is 
merely an interpretation of the good cause standard, and an 
agency is entitled to deference in construing its own regula-
tion. We conclude, however, that the Commission's new 
interpretation of "good cause" so fundamentally modifies that 

__________
interest; whether a petitioner's presence will help develop a sound 
record; whether petitioner's interest will be adequately represented 
by existing parties; and the extent to which a petitioner's partic-
ipation will broaden the issues or delay the proceeding. See 10 
C.F.R. s 2.714(a)(1), (b)(1).

standard, as previously interpreted by the agency, that it 
constitutes an amendment, requiring notice and comment.

A. The Incompatibility of the "Good Cause" and "Unavoid-
 able and Extreme Circumstances" Standards

 The NRC's published regulations provide that "not later 
than fifteen days prior to the holding ... of the first prehear-
ing conference, the petitioner shall file a supplement to his or 
her petition to intervene that must include a list of conten-
tions which petitioner seeks to have litigated in the hearing." 
NRC Rules of Practice and Procedure for Domestic Licensing 
Proceedings and Issuance of Orders, 10 C.F.R. s 2.714(b)(1) 
(1999). However, a different provision of the same Rules 
provides: "whenever an act is required or allowed to be done 
at or within a specified time, the time fixed or the period of 
time prescribed may for good cause be extended or shortened 
by the Commission or the presiding officer." Id. s 2.711(a) 
(emphasis added).4 When Whistleblower filed a motion for 
an extension of time, the Board followed the directives of the 
Commission's referral order and applied the "unavoidable and 
extreme circumstances" test in rejecting the motion. Whis-
tleblower alleges that the "unavoidable and extreme circum-
stances" test amounts to an amendment of section 2.711 and 
is therefore invalid because it was not adopted through notice 
and comment.

 A basic tenet of administrative law is that an agency's 
interpretation of its own regulations is given " 'controlling 
weight unless it is plainly erroneous or inconsistent with the 
regulation.' " Thomas Jefferson Univ. v. Shalala, 512 U.S. 
504, 512 (1994) (quoting Bowles v. Seminole Rock & Sand Co., 
325 U.S. 410, 414 (1945)). However, an equally well-
established administrative law principle provides that an 
agency may not adopt an interpretation of its own regulation 
which either contradicts the plain meaning of the regulation, 
see Ohio Power Co. v. FERC, 954 F.2d 779, 783 (D.C. Cir. 

__________
 4 Moreover, 10 C.F.R. s 2.714(b)(1) provides that "additional time 
for filing" a supplement to contentions may be granted based on the 
same balance of factors for admitting late-filed contentions. 10 
C.F.R. s 2.714(a)(1), (b)(1).

1992) ("[N]o deference is owed an interpretation at odds with 
the plain meaning of the text."); Guard v. NRC, 753 F.2d 
1144, 1148-49 (D.C. Cir. 1985) (noting that "high regard" of 
deference to NRC interpretation of its own regulation "is 
appropriate only so long as the agency's interpretation does 
no violence to the plain meaning of the provision at issue"); 
Union of Concerned Scientists v. NRC, 711 F.2d 370, 381 
(D.C. Cir. 1983) ("[W]hen an agency's interpretation of its 
own rules flies in the face of the language of the rules 
themselves, it is owed no deference."), or fundamentally 
changes the agency's own prior interpretation of the regula-
tion. See Hudson v. FAA, -- F.3d --, --, No. 98-1295, 1999 
WL 798067, at * 4 (D.C. Cir. Oct. 8, 1999) (noting that 
" '[o]nce an agency gives its regulation an interpretation, it 
can only change that interpretation as it would formally 
modify the regulation itself: through the process of notice 
and comment rulemaking.' ") (quoting Paralyzed Veterans of 
Am. v. D.C. Arena L.P., 117 F.3d 579, 586 (D.C. Cir. 1997)); 
Alaska Prof'l Hunters Ass'n v. FAA, 177 F.3d 1030, 1035 
(D.C. Cir. 1999) (striking down new agency interpretation 
that was contrary to advice given for 30 years by its Alaska 
office and informal agency statements as an effective amend-
ment of FAA regulations); National Family Planning and 
Reprod. Health Ass'n v. Sullivan, 979 F.2d 227, 239-40 (D.C. 
Cir. 1992) (striking down a Department of Health and Human 
Services interpretation of its own regulation to allow Title X 
physicians to counsel abortion as a method of family planning 
contrary to earlier interpretation by agency barring all Title 
X personnel from discussing the possibility of abortion). The 
reason behind this ban on radical reinterpretation of publish-
ed regulations is that "to allow an agency to make a funda-
mental change in its interpretation of a substantive regulation 
without notice and comment would undermine those APA 
requirements." Paralyzed Veterans, 117 F.3d at 586; see 
also Shalala v. Guernsey Mem'l Hosp., 514 U.S. 87, 100 
(1995) (concluding that notice and comment rulemaking would 
be required if an agency were to effect "a substantive 
change" in its regulations by adopting a new position inconsis-
tent with its existing regulations). This principle applies 

whether the agency adopts the fundamental change in inter-
pretation in a purported policy statement, interpretative rule 
or adjudication. See, e.g., Syncor Int'l Corp. v. Shalala, 127 
F.3d 90, 92 (D.C. Cir. 1997) (reinterpretation advanced in 
FDA publication labeled a notice and referred to in its text as 
a policy statement); Paralyzed Veterans, 117 F.3d at 588 
(interpretative rule); Caraballo v. Reich, 11 F.3d 186, 195 
(D.C. Cir. 1993) (Department of Labor "interpretative" state-
ment expounded in the course of an adjudication).

 While "good cause" appears at first blush an exceedingly 
flexible term (some might say a near-empty vessel, waiting to 
be filled), there are limits to its meaning and to the concept it 
represents. The Supreme Court itself recognized this recent-
ly. See Jones v. United States, -- U.S. --, --, 119 S. Ct. 
2090, 2098 (1999) (holding that phrase "good cause" in 18 
U.S.C. s 3593(b)(2)(C), which provides for impaneling a new 
jury in a sentencing hearing if the trial jury has been 
discharged for good cause, "cannot be read so expansively as 
to include the jury's failure to reach a unanimous decision"). 
Furthermore, this court has held that even though a word in 
an agency rule may not have a precise meaning, an agency's 
interpretation of the word is invalid if it is far removed from 
the recognized meaning of the term. See C.F. Communica-
tions Corp. v. FCC, 128 F.3d 735, 739 (D.C. Cir. 1997) 
(concluding that while the word "premises" does not have a 
single fixed meaning, that "does not convert the word into a 
sort of Rorschach test, permitting the Commission to read 
into the word anything it pleases" and rejecting as plainly 
erroneous agency interpretation divorced from term's estab-
lished definition).

 Section 2.711 does not itself define "good cause," but the 
history of the regulation makes clear that its purpose was to 
give the Commission flexibility to alter the time limits in its 
proceedings when that course would not unfairly prejudice 
the parties. In 1962, when the agency amended the precur-
sor to section 2.711, it explained that it was "designed to 
expedite proceedings without sacrificing the fair and impartial 
consideration of the issues." Revision of Rules, 27 Fed. Reg. 
377, 377 (1962). In 1972, the Commission codified section 
2.711 in its present form and included a specific finding that 

section 2.711 allowed modifications of time limits "in appropri-
ate cases, where it would not prejudice a party." Restructur-
ing of Facility License Application Review and Hearing Pro-
cesses, 37 Fed. Reg. 15,127, 15,129 (1972). Clearly, a balance 
of the Commission's administrative convenience and fair op-
portunities for parties to participate meaningfully in its pro-
ceedings was intended.

 And indeed, the NRC has in the past consistently interpret-
ed good cause for extending or shortening time to file conten-
tions as the presence of a "good reason" why either the 
parties or the Commission desire changing normal time 
schedules. See, e.g., In re Cleveland Elec. Illuminating Co. 
(Perry Nuclear Power Plant, Units 1 & 2), 18 N.R.C. 1400, 
1401 (1983) ("Section 2.711 permits the Board to reduce time 
limits where there is a good reason to do so."); United States 
Dep't of Energy Project Management Corp. Tenn. Valley 
Auth. (Clinch River Breeder Reactor Plant), 17 N.R.C. 158, 
162 (1983) (construing 10 C.F.R. s 2.714(a)'s requirement of 
"good cause" for failure to file on time as "good reason"); In 
re Virginia Elec. & Power Co. (N. Anna Power Station, 
Units 1 & 2), 4 N.R.C. 98, 101 (1976) (same); In re Duquesne 
Light Co. (Beaver Valley Power Station, Unit 2), 7 A.E.C. 
959, 968 (1974) (same). Neither party here disputes that the 
new "unavoidable and extreme circumstances" test for "good 
cause" requires a significantly stronger showing than a "good 
reason" for an extension of time to file a contention. There 
can be little doubt that the "unavoidable and extreme circum-
stances" test inevitably reflects a significant change from the 
Commission's prior interpretation of the "good cause" stan-
dard; as such, it falls under the doctrine that when an agency 
has given a regulation an authoritative interpretation, and 
later significantly changes that interpretation, it has effectu-
ated an amendment of that rule which will be invalid unless it 
gives notice and comment. See Alaska Prof'l Hunters, 177 
F.3d at 1034; Paralyzed Veterans, 117 F.3d at 586; see also 
Syncor, 127 F.3d at 94-95 (noting that a modification of an 
interpretation of an agency rule "will likely require a notice 
and comment procedure").

 The Commission's rejection of Whistleblower's asserted 
justifications for an extension of time--the need for its ex-
perts to study the voluminous application to formulate conten-
tions and the novelty and complexity of issues raised by the 
application in the context of the first license renewal proceed-
ing for a nuclear power plant--is also inconsistent with prior 
NRC cases in which the Commission has granted extensions 
of time based on the complexity of the issues involved or the 
need to give experts time to review an application, or both. 
See In re Private Fuel Storage, L.L.C. (Indep. Spent Fuel 
Storage Installation), No. 72-22-ISFSI, 1997 WL 687737, at 
*3 (N.R.C. Oct. 7, 1997) (granting extension of time for filing 
contentions based on need of party to provide its experts with 
additional time to review application and the length and 
complexity of the application); In re Northern Ind. Pub. 
Serv. Co. (Bailey Generating Station, Nuclear 1), 12 N.R.C. 
191, 217 (1980) (finding good cause to treat as timely conten-
tions filed after deadline due to the short time for preparation 
set by Prehearing Conference Order as well as the complexity 
of the newly-filed contentions); In re Commonwealth Edison 
Co. (Zion Station, Units 1 & 2), 6 A.E.C. 827, 827 (1973) 
(finding good cause under section 2.711 for an extension of 
time for filing exceptions and supporting briefs for appeal of 
decision due to the length of the initial decision and the 
number and complexity of the issues involved). Indeed, our 
court has held that an agency has an obligation in an adjudi-
cation to follow, distinguish, or overrule its own precedent 
and we have not hesitated to strike down agency action when 
it fails to meet this obligation. See Steger v. Defense Investi-
gative Serv. Dep't of Defense, 717 F.2d 1402, 1406 (D.C. Cir. 
1983) (reversing Merit Systems Protection Board decision to 
deny attorney's fees which disregarded without explanation 
factors used in prior Board decisions for determining if 
attorney's fees are appropriate); Local 777, Democratic Un-
ion Org. Comm. v. NLRB, 603 F.2d 862, 872, 882 (D.C. Cir. 
1979) (refusing to enforce NLRB interpretation of "employ-
ee" and "independent contractors" in 29 U.S.C. s 152(3) 
which did not explain inconsistency with most recent NLRB 
opinion on subject). When Whistleblower offered reasons for 

an extension of time similar to those which the Commission 
has approved in the past, the Board rejected them out of 
hand and the Commission affirmed the Board's decisions, 
using the "unavoidable and extreme circumstances" test with-
out explaining or distinguishing its own prior precedent ap-
proving such reasons as qualifying for "good cause". At no 
time did the Commission ever address its own prior interpre-
tation of "good cause" in circumstances like this one when a 
party asks for more time to have its experts review material 
in a complex case. Moreover, the Commission in this case 
seems to have effectuated a result entirely different from its 
prior cases where it found that reasons for delay similar to 
those encountered by Whistleblower constituted "good cause" 
for an extension of time.

 This court has long held that an agency may not use its 
interpretative powers to " 'constructively rewrite [a] regula-
tion' or 'effect a totally different result.' " Sentara-Hampton 
Gen. Hosp. v. Sullivan, 980 F.2d 749, 759 (D.C. Cir. 1992) 
(quoting National Family Planning and Reprod. Health 
Ass'n v. Sullivan, 979 F.2d 227, 236 (D.C. Cir. 1992)). This 
case is not dissimilar to both Alaska Professional Hunters 
and Syncor. In Alaska Professional Hunters, we invalidated 
a Federal Aviation Administration ("FAA") interpretation of 
its own rules to treat hunting guides who flew clients to and 
from hunting sites as commercial operators contrary to the 
prior interpretation of those rules given as advice to guides 
by the FAA's Alaska Region office for more than thirty years 
and informal statements by the agency that guides were 
noncommercial operators. See 177 F.3d at 1035-36. Similar-
ly, in Syncor we held invalid 1995 Food and Drug Administra-
tion ("FDA") guidelines which interpreted the registration 
provisions of the Federal Food Drug and Cosmetic Act 
("FFDCA") to apply to positron emission tomography 
("PET") radiopharmaceuticals because they differed from 
1984 FDA guidelines which stated that nuclear pharmacists 
using the process by which pharmacies compound PET radio-
pharmaceuticals were not required to register under the 
FFDCA. See 127 F.3d at 95-96. Like the FAA in Alaska 

Professional Hunters and the FDA in Syncor, the NRC in 
this case has adopted an interpretation that effects a totally 
different result for a motion for an extension of time prem-
ised upon the need to give experts time to review an applica-
tion and to address novel and complex issues from that which 
would have occurred under the prior "good cause" standard.

 Another indicator that the Commission was significantly 
changing the usual meaning of "good cause" when it adopted 
the "unavoidable and extreme circumstances" test is that it 
did not apply the same test to determine if its own reduction 
of the normal time allotted to intervenors to file contentions 
was valid. Curiously, the Commission made no mention of 
the "unavoidable and extreme circumstances" standard when 
it shortened intervenor deadlines "for good cause" in order to 
expedite proceedings. The Commission concluded that it had 
"good cause" to do so because the alteration of the time frame 
would permit both the Board and Whistleblower to consider 
the NRC staff's answer to the proposed contentions prior to 
the scheduled date of the prehearing conference whereas 
under the NRC's published rules the staff's answer would not 
be due until the day of the conference. Surely such a reason 
does not qualify as an "unavoidable and extreme circum-
stance" and the Commission never said it did. In the absence 
of any explanation of the differing ways in which it interpret-
ed the same phrase depending on whose interests were at 
stake, it appears that the Commission was amending the test 
for the intervenors only, even though the rule itself makes no 
such distinction.

 Additionally, we note that the Commission has commonly 
employed standards similar to "unavoidable and extreme 
circumstances" elsewhere in its rules, yet has never suggest-
ed that they are the same as "good cause." For example, the 
Commission has interpreted "special circumstances" in its 
rule allowing a complete waiver of a rule where "the applica-
tion of the rule ... would not serve the purposes for which 
the rule or regulation was adopted," 10 C.F.R. s 2.758, to 
mean that a waiver will only be granted in "unusual and 
compelling circumstances." Public Serv. Co. of N.H. (Sea-
brook Station, Units 1 & 2), 30 N.R.C. 231, 235 (1989); 

Public Serv. Co. of N.H. (Seabrook Station, Units 1 & 2), 29 
N.R.C. 234, 239 (1989); In re Northern States Power Co. 
(Monticello Nuclear Generating Plant, Unit 1), 5 A.E.C. 25, 
26 (1972). The Commission has also interpreted its rule 
allowing interlocutory review of an order only if it "[t]hreat-
ens ... immediate and serious irreparable impact which ... 
could not be alleviated through a petition for review of the 
... final decision," or "affects the basic structure of the 
proceeding in a pervasive or unusual manner," 10 C.F.R. 
s 2.786(g), as allowing such review only "in the most compel-
ling circumstances." In re Sequoyah Fuels Corp. (Gore, 
Okla. Site), 40 N.R.C. 55, 59 (1994) (citing In re Pacific Gas 
& Elec. Co. (Diablo Canyon Nuclear Power Plant, Units 1 & 
2), 8 N.R.C. 406, 410 (1978)). However, we are not aware of a 
single prior instance in which the NRC has described or 
interpreted "good cause" as requiring "unusual," "extreme," 
"unavoidable" or "compelling" circumstances.

 There may be good reason for this omission. "Good cause" 
does not ordinarily convey a meaning of "unavoidable and 
extreme circumstances." Virtually every dictionary published 
around the time that section 2.711 was amended to its present 
form defined "good cause" as a legally sufficient cause that is 
reasonable under the circumstances. See, e.g., Webster's 
Third New International Dictionary 978 (1976) ("cause or 
reason sufficient in law: one that is based on equity or justice 
or that would motivate a reasonable man under all the 
circumstances"); Black's Law Dictionary 623 (5th ed. 1979) 
("substantial reason, one that affords a legal excuse. Legally 
sufficient ground or reason ... cause as would compel a 
reasonably prudent person ... under similar circumstances 
... that cause that to an ordinary intelligent man is a 
justifiable reason for doing or not doing a certain thing"); 
Ballentine's Law Dictionary 527 (3d ed. 1969) ("substantial 
reason, a legal excuse ... legal cause ... reasonable cause"). 
In contrast, "unavoidable and extreme" has a quite different 
meaning. Although some definitions of "unavoidable cause" 
might conceivably fit within the meaning of "good cause," see, 
e.g., Black's Law Dictionary 1366 ("a cause which reasonably 
prudent and careful men under like circumstances do not and 

would not ordinarily anticipate"); Ballentine's Law Dictio-
nary 1311 ("a cause which reasonably prudent and cautious 
men under like circumstances do not and would not ordinarily 
anticipate"), we think the additional requirement that the 
circumstances be "extreme" as well as "unavoidable" takes it 
into a different realm of outlier causes rather than reasonable 
causes. See, e.g., 5 Oxford English Dictionary 618-19 (2d ed. 
1989) ("Outermost, farthest from the centre ... opposed to 
moderate ... Of a case, circumstance, supposition: Present-
ing in the utmost degree some particular characteristic ... 
the utmost point or verge ... an end ... the utmost imagin-
able or tolerable degree of anything"); Black's Law Dictio-
nary 528 ("[a]t the utmost point, edge or border; most 
remote. Last; conclusive. Greatest, highest, strongest, or 
the like."); Webster's Third New International Dictionary 
807 ("existing in the highest or the greatest possible degree; 
... most severe; most stringent ... going beyond the limits 
of reason, necessity or propriety ... situated at the farthest 
possible point from the center"); Ballentine's Law Dictio-
nary 447 ("Outermost; utmost"). These dictionary defini-
tions make the difference between the two standards appar-
ent: whereas "good cause" would allow an extension of time 
in situations not due to negligence that would ordinarily cause 
delay, the "unavoidable and extreme circumstances" standard 
would allow extensions only in the most extraordinary situa-
tions. The transfer from the reasonable to the most unusual 
results in a significant reduction of a litigant's ability to 
obtain an extension of time to file contentions.

 While we conclude that "unavoidable and extreme circum-
stances" is a fundamental modification of the Commission's 
"good reason" definition of "good cause" requiring notice and 
comment, we acknowledge that the term "good cause" itself 
initially affords the agency a great deal of flexibility and 
discretion to decide its content under individual circum-
stances.5 Given the expertise and experience of the NRC 

__________
 5 The meaning of "good cause" may also be substantially influ-
enced by congressional intent in providing for a "good cause" 
exception. See, e.g., Tennessee Gas Pipeline Co. v. FERC, 969 F.2d 

with licensing, it is most favorably situated to make such a 
determination through the reasonable balancing of agency 
and intervenor interests that is inherent in the term "good 
cause"; and its judgment will in the vast majority of cases be 
upheld. It can for instance require a greater showing of need 
for an extension of time in cases where the Commission's 
need to expedite proceedings significantly outweighs a party's 
need for more time. However, this flexibility does not in-
clude authority to constructively amend a "good cause" stan-
dard by adopting an interpretation that departs radically 
from its own precedent, without notice and comment, and 
which it applies only to third parties, not to itself.

B. Prejudice to the Petitioner to Intervene

 Only if there is prejudice to a challenging party can agency 
action be invalidated under the APA. See 5 U.S.C. s 706 
("[D]ue account should be taken for the rule of prejudicial 
error."); see also Fried v. Hinson, 78 F.3d 688, 690-91 (D.C. 
Cir. 1996) (citing American Farm Lines v. Black Ball Freight 
Serv., 397 U.S. 532, 539 (1970)). The Commission argues that 
even if it applied the wrong standard to Whistleblower's 
motion for an extension of time, Whistleblower was not 
harmed by this error because the contentions it ultimately 
submitted were patently deficient under NRC regulations 
governing the specificity of contentions. See 10 C.F.R. 
s 2.714(b)(2). The contentions Whistleblower submitted did 
not set forth any specific grounds for its allegations and 
merely referred to NRC staff RAIs for their bases. The 
NRC has consistently held that mere references to RAIs are 

__________
1141, 1144 (D.C. Cir. 1992) (holding that the APA "good cause" 
exception to notice and comment requirement of agency rulemaking 
was intended by Congress "to be narrowly construed" and limited 
to "emergency situations"); Environmental Defense Fund v. EPA, 
716 F.2d 915, 920 (D.C. Cir. 1983) (same); American Fed'n of Gov't 
Employees v. Block, 655 F.2d 1153, 1156 (D.C. Cir. 1981) (deriving 
"emergency situations" test from Senate Report). But cf. Bjella v. 
McPeters, 806 F.2d 211, 216 (10th Cir. 1986) (holding that "good 
cause" exception to sanction for late-filed transcripts in Judicial 
Conference Report was not incompatible with individual court plan 
allowing exception only in "unusual or extreme circumstances").

insufficient to meet the specificity requirements under 10 
C.F.R. s 2.714. See Rules of Practice for Domestic Licensing 
Proceedings--Procedural Changes in the Hearing Process, 54 
Fed. Reg. 33,168, 33,171 (1989) (noting that the Commission 
rejects the argument that "petitioners not be required to set 
forth facts in support of contentions until the petitioner has 
access to NRC reports and documents"); In re Sacramento 
Mun. Util. Dist. (Rancho Seco Nuclear Generating Station), 
36 N.R.C. 135, 136 (1992) (holding that the attempt to incor-
porate by reference the questions asked by the staff concern-
ing environmental report fails to comply with the Commis-
sion's pleading requirements).

 Even though Whistleblower ultimately submitted conten-
tions on October 13 that were deficient under the Commis-
sion's specificity requirements, we think it was nonetheless 
prejudiced by the Commission's use of the "unavoidable and 
extreme circumstances" test to deny its requests for exten-
sions at two earlier points in the proceeding. First, the 
extension which Whistleblower originally requested in August 
would have moved the time for filing contentions back two 
months. The Commission's decision to grant Whistleblower 
an extension to September 30th did little to remove any 
prejudice from the Board's denial of its earlier request be-
cause by the time it was granted, Whistleblower had only two 
weeks left in which to file. Additionally, it reinforced the 
Board's use of the "unavoidable and extreme circumstances" 
test. We cannot know whether Whistleblower's original re-
quest for a two month extension would have been granted in 
full under the good cause standard. At the very least, it is 
strongly possible that Whistleblower would have received the 
extension because it had asserted factors which had been 
approved by the Commission in the past as sufficient to 
justify good cause for an extension. See, e.g., In re Northern 
Ind. Pub. Serv. Co. (Bailey Generating Station, Nuclear 1), 
12 N.R.C. 191, 217 (1980) (finding good cause to treat as 
timely contentions filed after deadline due to the short time 
set for filing contentions in the Order Setting the Prehearing 
Conference and the complexity of the newly-filed conten-
tions).

 As the Status Report and Motion to Vacate and Reschedule 
the Initial Prehearing Conference filed by Whistleblower on 

October 1 demonstrate, Whistleblower continued to assert 
throughout the aborted proceeding that the "unavoidable and 
extreme circumstances" test was improper, thereby adequate-
ly preserving the issue that it never had time to prepare 
adequate contentions. Moreover, although the October 13 
contentions were inadequate, Whistleblower clearly indicated 
on the face of the contentions that it desired to preserve its 
objection that it needed more time (the contentions were filed 
"without prejudice to Petitioner's October 1, 1998 Motion to 
Vacate"). J.A. at 225 n.1. Formally, Whistleblower labeled 
its October 13 set of contentions a "first supplemental set of 
contentions," specifically asserting its right to file contentions 
up until fifteen days before the prehearing conference as set 
out in 10 C.F.R. s 2.714(b)(1). Therefore, Whistleblower 
preserved its argument that the Commission improperly used 
the "unavoidable and extreme circumstances" test to deny its 
motion for an extension of time even as it filed contentions on 
October 13.

 Whistleblower was obviously scrambling to come up with 
the most specific contentions it could within the short time it 
had to file. Significantly, Whistleblower actually submitted 
additional information to the Board on October 16, the day 
the petition to intervene was finally rejected. If the "good 
cause" standard had been used to adjudicate Whistleblower's 
motion to extend the time for filing contentions until mid-
November, Whistleblower by that time would likely have 
submitted sufficient information to support an adequate con-
tention. In sum, the strong possibility that Whistleblower 
would have been granted an extension until mid-November 
had the "good cause" standard been applied and that it could 
have by that time submitted adequate contentions is sufficient 
to show prejudice. See Presbyterian Med. Ctr. of the Univ. 
of Penn. Health Sys. v. Shalala, 170 F.3d 1146, 1151 (D.C. 
Cir. 1999) (concluding that prejudicial error exists if there is a 
possibility that the error would have resulted in some change 
in the final outcome) (citing Small Refiner Lead Phase-Down 
Task Force v. EPA, 705 F.2d 506, 521 (D.C. Cir. 1983)); 
Weyerhaeuser Co. v. Costle, 590 F.2d 1011, 1031 n.27 (D.C. 
Cir. 1978) (concluding that prejudicial error exists "[I]f [agen-
cy] action is improper, and if we cannot be sure that the 

Agency would have reached the same conclusion" if it acted 
properly).

 III. Conclusion

 For the foregoing reasons, we vacate the order of the 
Nuclear Regulatory Commission denying the National Whis-
tleblower Center's petition to intervene and dismissing the 
hearing in connection with Baltimore Gas and Electric Com-
pany's license renewal application for the Calvert Cliffs Nu-
clear Power Plant. We remand to the agency to determine 
whether Whistleblower had "good cause" for an extension of 
time to file contentions under the interpretation of "good 
cause" the Commission had employed prior to the Calvert 
Cliffs application. If National Whistleblower Center meets 
that standard and if it subsequently files adequate conten-
tions before a new deadline, the Commission must allow it an 
opportunity to meaningfully participate in the remainder of 
the proceeding.

 So ordered.